**UNITED STATES of America**

v.

**Robert CHESTMAN, Defendant.**

**No. 88 Cr. 455 (JMW).**

United States District Court,
S.D. New York.

Jan. 13, 1989.

Otto Obermaier, Barry A. Bohrer, Alan J. Brudner, David Meister, Obermaier, Morvillo & Abramowitz, New York City, for defendant Robert Chestman.

Robert Plotz, Asst. U.S. Atty., New York City, Daniel Goelzer, Jacob H. Stillman, Richard A. Kirby, Andrew Bennet, S.E.C., Washington, D.C., for U.S.

## OPINION AND ORDER

WALKER, District Judge:

Before the Court are defendant's pre-trial motions seeking dismissal of certain counts of the indictment; severance of another count; a declaration that the indictment is multiplicitous; and suppression of tape recorded conversations. For the reasons set forth below, the Court denies defendant's motions in their entirety.

## BACKGROUND

The indictment in this case contains thirty-one counts. In brief, defendant Robert Chestman is charged with ten instances of trading in the stock of Waldbaum, Inc., on November 26, 1986, on the basis of material, nonpublic information—allegedly supplied to him by Keith Loeb, a member of the Waldbaum family—shortly before the public announcement that Waldbaum, Inc. would be acquired by the Great Atlantic & Pacific Tea Company. More specifically, the indictment charges Chestman with ten counts of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5 promulgated thereunder; ten counts of securities fraud in violation of 15 U.S.C. § 78n(e) and Rule 14e–3 promulgated thereunder; and ten counts of mail fraud in violation of 18 U.S.C. § 1341. Each of the ten transactions is thus alleged to have occurred in violation of three provisions of law. In addition, Chestman is charged with one count of perjury in violation of 18 U.S.C. § 1621 arising out of sworn testimony he gave before the Securities and Exchange Commission ("SEC") relating to the Waldbaum transaction.

Pursuant to Rule 12(b) Fed.R.Crim.P., Chestman now moves this Court for an order (1) dismissing the Rule 10b–5 counts because the misappropriation theory on which these charges are based is invalid as a matter of law; (2) dismissing the mail fraud counts because there is allegedly no nexus between the mailings and the alleged scheme to defraud; (3) severing the perjury count on the basis that its joinder with the remaining counts is inherently prejudicial and deprives defendant of a fair trial; (4) suppressing tape recorded conversations of defendant because they were allegedly obtained in violation of ethical obligations; (5) dismissing the Rule 14e–3 counts because the rule is an invalid exercise, as applied in a criminal prosecution, of the SEC's rule-making authority; and (6) declaring the first thirty counts of the indictment to be multiplicitous and directing the government to elect.

The first three motions are more easily dismissed than the latter motions, particularly because defendant's contention that Rule 14e–3 is invalid raises issues of

first impression. Defendant concedes that, under the law of this Circuit, the Rule 10b–5 and mail fraud counts are properly charged. Defendant has made these first two motions to preserve his position on issues he believes are still subject to Supreme Court review. *See* Def. Mem. at 3, 12. Accordingly, Chestman's motions to dismiss the 10b–5 and mail counts are denied. The Court further denies defendant's motion for a severance of the perjury count against him. There is no undue prejudice to Chestman from the joinder of the perjury count since the evidence of the alleged perjury would be admissible at the trial of the substantive offenses as a false exculpatory statement. The law in this Circuit is settled, and it "clearly supports the joinder of underlying substantive crimes with perjury counts where, as here, the false declarations concern the substantive offenses." *United States v. Potamitis,* 739 F.2d 784, 791 (2d Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984).

The Court will now address in turn the defendant's three remaining motions.

## DISCUSSION

*1. Suppression of the two taped conversations:*

■ Chestman has moved to suppress two tapes of conversations between himself and Keith Loeb, who was cooperating with the government, that were recorded after Chestman had appeared with an attorney at the SEC. Chestman argues that the recordings violate Disciplinary Rule 7–104(A)(1) of the American Bar Association's Code of Professional Responsibility ("DR 7–104(A)(1)").

On or about April 20, 1987, and again later that month, Loeb secretly recorded two conversations he had with defendant. Defendant argues that Loeb was acting on behalf of the United States Attorney's office at a time when the government allegedly knew that Chestman was represented by counsel in connection with this matter, and that therefore the government's actions violate DR 7–104(A)(1). That rule states:

A. During the course of his representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

On the basis of that rule, defendant moves to suppress the two tape recorded conversations.[1]

The Second Circuit Court of Appeals squarely addressed this issue in *United States v. Hammad,* 846 F.2d 854 (2d Cir. 1988) ("*Hammad I*"), and again when it revised that opinion, on its own initiatve, in *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988) ("*Hammad II*"). The Second Circuit framed the question in these terms:

[T]o what extent does DR 7–104(A)(1) restrict the use of informants by government prosecutors prior to indictment, but after a suspect has retained counsel in connection with the subject matter of a criminal investigation?

*Hammad II,* at 839. In *Hammad II,* the Court of Appeals sought to balance the twin goals of respecting the protection afforded a defendant by DR 7–104(A)(1), which goes beyond the protection provided by the Sixth Amendment, *id.* at 838, and of "imposing adequate safeguards without crippling law enforcement." *Id.* at 839. Recognizing that "prosecutors have a responsibility to perform investigative as well as courtroom-related duties in criminal matters," *id.* at 839, the court concluded that

[T]he use of informants by government prosecutors in a pre-indictment, non-custodial situation, absent the type of egregious misconduct that occurred in this case [where the prosecutor used a coun-

---

1. The Government notes that the second tape recording was not made at the direction of the United States Attorney's office or any agent of that office. *See* Gov. Mem. at 31, n. 28. As a result, it does not fall within the restrictions of *Hammad II, see infra.* The point is academic; the Court's decision today would apply to the second recording even had it been made at the behest of the Government.

terfeit grand jury subpoena, bearing the purported seal of the district court and the false signature of the Clerk], will generally fall within the "authorized by law" exception to DR 7–104(A)(1) and therefore will not be subject to sanctions [such as suppression.]

*Id.* at 840.

For the purposes of defendant's motion, the Court assumes not only that defendant was represented by counsel in connection with this criminal proceeding at the time the two recordings were made, but also that the government was aware of that representation.[2] The Court concludes that the government's actions in this case fall within the "authorized by law" exception to DR 7–104(A)(1). As the Second Circuit explained, a prosecutor is " 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *Hammad II, supra* at 839. In this case, the recordings were pre-indictment, non-custodial, and occurred in the absence of any "egregious misconduct"—such as the prosecutor's use in *Hammad* of a sham Grand Jury subpoena —that might support their suppression.

A wholly separate ground supports the Court's decision as well. In *Hammad II,* even in the face of the prosecutor's "egregious misconduct," the Court of Appeals reversed the district court's decision to suppress the evidence at issue because of the unsettled nature of the law:

> [T]he government should not have its case prejudiced by suppression of its evidence when the law was previously unsettled in this area. Therefore, in light of the prior uncertainty regarding the reach of DR 7–104(A)(1), an exclusionary remedy is inappropriate in this case.

*Id.* at 842. The conversations at issue in this case occurred in April 1987; the district judge in *Hammad* issued his suppression order on September 21, 1987, *see* 678 F.Supp. 397 (E.D.N.Y.1987); *Hammad I* was decided on May 12, 1988; *Hammad II* was issued on September 23, 1988. If the Second Circuit considered the law unsettled enough during September 1987 to justify its reversal of the district court's decision in *Hammad,* then the law was no less unsettled in April 1987 when the recordings at issue here were made under more benign circumstances. This uncertainty as to the law provides an independent basis for denying defendant's motion to suppress.

### 2. The Rule 14e–3 counts:

■ Chestman has moved to dismiss Counts 11 through 20 under Rule 14e–3 on the ground that the rule as promulgated represents an invalid exercise of the SEC's rulemaking authority pursuant to § 14(e). It appears that this issue, raised in the context of a criminal proceeding, is one of first impression.

At the outset, it is important to note the appropriate standard of review. Congress has delegated substantive rulemaking authority to the SEC. As the Supreme Court has explained, in such a situation a department or agency head

> adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner ... [The regulation or rule] is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*Batterton v. Francis,* 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448

---

**2.** The government, for its part, does not accept these two assumptions. However, the Court's decision on the question of suppression renders unnecessary an evaluation of the government's position on these two points. Furthermore, a suppression hearing is thus unnecessary. The Court assumes, *arguendo,* the very facts defendant might hope to establish at such a hearing.

The Court does note, however, that the defendant has not even alleged that his attorney provided the United States Attorney's office with explicit, direct notice that defendant was being represented in connection with the subject matter of this case. Such explicit, direct notice was provided in *Hammad. See Hammad II, supra* at 836.

(1977) (citations omitted) (holding that Congress expressly delegated to the Secretary of Health and Human Services the power to prescribe standards for benefit eligibility). However, "deference is not to be a device that emasculates the significance of judicial review. Judicial deference to an agency's interpretation of a statute only sets the framework for judicial analysis; it does not displace it." *Securities Industry Association v. Federal Reserve Board*, 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed. 2d 107 (1984) (citations omitted). A court must reject practices "that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Id.* (citation omitted).

When reviewing the legislative history of SEC rules, it is also necessary to remember that "Congress recognized that efficient regulation of securities trading could not be accomplished under a rigid statutory program. As part of the 1934 Act Congress created the [Securities and Exchange] Commission, which is provided with an arsenal of flexible enforcement powers." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

In order to apply that standard of review and to assess fully defendant's arguments, it remains necessary first to examine the genesis of Rule 14e–3. After carefully reviewing the relevant statutory language, legislative history, and controlling judicial decisions, and after applying the above standard, this Court concludes that Rule 14e–3 represents a valid exercise of the SEC's rulemaking authority pursuant to § 14(e).

A. The legislative history of Rule 14e–3:

In 1968, Congress added § 14(e) to the Securities Exchange Act as part of what is popularly known as the Williams Act ("the Act").[3] The Supreme Court has reviewed at length the legislative history of the Williams Act and has squarely concluded that "the sole purpose of the [Act] was the protection of investors who are confronted with a tender offer." *Piper v. Chris–Craft Industries*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1976). The Court quoted the Act's sponsor, Senator Harrison Williams of New Jersey, who explained that

[t]his legislation will close a significant gap in investor protection under the Federal securities laws by requiring the disclosure of pertinent information to stockholders when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities.

113 Cong. Rec. 854 (1967), *Piper, supra* at 26, 97 S.Ct. at 941. Congress aimed "to protect the shareholders of target companies," the " 'pawn[s] in a form of industrial warfare.' " *Id.* at 28, 30, 97 S.Ct. at 942, 944 (citation omitted). The Court adopted a description of this section of the Act as "a disclosure provision," and quoted the then Chairman of the SEC: "[T]he general approach ...of this bill is to provide the investor ...an opportunity to examine and to assess the relevant facts ..." *Id.* at 27, 97 S.Ct. at 942. *See also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975) ("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information").

The Supreme Court has noted that the legislative history "specifically concerning

**3.** Section 14(e) provides in full:
It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.
15 U.S.C. Section 78n(e).

§ 14(e) is sparse." *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 11, 105 S.Ct. 2458, 2464, 86 L.Ed.2d 1 (1985). After reviewing what was available, the Court explained that

> Section 14(e) adds a 'broad antifraud prohibition' modeled on the antifraud provisions of § 10(b) of the Act and Rule 10b–5. It supplements the more precise disclosure provisions found elsewhere in the Williams Act, while requiring disclosure more explicitly addressed to the tender offer context than that required by § 10(b).... Nowhere in the legislative history is there the slightest suggestion that § 14(e) serves any purpose other than disclosure ...

*Id.* at 10–11, 105 S.Ct. at 2463–2464 (citations omitted).

In 1970, Congress amended the Act. To § 14(e), Congress added one sentence, of particular importance to this case:

> The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

The Supreme Court has explained the significance of that addition:

> In adding the 1970 amendment, Congress ...provided a mechanism for defining and guarding against those acts and practices which involve material misrepresentation or nondisclosure. The amendment gives the [SEC] latitude to regulate nondeceptive activities as a

"reasonably designed" means of preventing manipulative acts ...

*Id.* at 11 n. 11, 105 S.Ct. at 2464 n. 11.

In September 1980, pursuant to the 1970 amendment to § 14(e), the SEC adopted Rule 14e–3, which, in the tender offer context, bars trading by any person knowingly in possession of material, nonpublic information acquired from an insider.[4] By its terms, the rule imposes a "disclose or abstain from trading" duty on any person who falls within its boundaries, even in the absence of a relationship of trust and confidence, or any fiduciary duty. When it adopted the rule, the SEC explained the ills that the rule was designed to cure: first, the inability of investors to make informed investment decisions when they trade with persons who possess material, nonpublic information; and second, the unnatural and unexplained market disruptions such trading caused. *See* SEC Release No. 17120 (Sept. 4, 1980), 45 Fed.Reg. 60,410.

The government notes that when Congress was considering the 1970 amendment, conferring on the SEC its rulemaking authority and prior to its enactment, the SEC submitted a memorandum to Senator Williams that explained the types of practices the SEC would prevent by rulemaking. Among other situations, the SEC described the situation in which

> [a] person who has become aware that a tender offer is to be made, or has reason to believe that such bid will be made, may fail to disclose material facts with respect thereto to persons who sell to him securities for which the tender bid is to be made ...

**4.** Rule 14e–3 provides, in relevant part:

If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows and has reason to know has been acquired directly or indirectly from:

  (1) The offering person,
  (2) The issuer of the securities sought by such tender offer, or

  (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise. The rule also contains certain limited exceptions which the parties agree are not at issue here.

Gov. Mem. at 10; Hearings on S. 3431 before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 91st Cong., 2d Sess. 12 (1970).

Judge Lasker of this court recently examined Rule 14e–3. In *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179 (S.D.N.Y.1981), the defendant sought to limit the scope of Rule 14e–3 to cover only transactions between the tender offeror and the shareholder of the target company, not transactions in the open market in which the shareholder of the target company may engage. *Id.* at 1191. In rejecting the defendants' attempts to limit the rule's reach, Judge Lasker described the purposefully adaptable and versatile nature of § 14(e):

> Congress intended the precise application of [§ 14(e)] to be worked out over time, in the light of practical experience as to takeover practices.... "Congress 'preferred to leave to the Commission and the courts the ability to deal effectively with transactions, not envisioned or imagined in 1968, which required the application of the statutory provisions of the Williams Act for the protection of investors'" [quoting letter from Senator William Proxmire and colleagues to then SEC Chairman Harold M. Williams].... [T]he statutory language [granting rule-making authority to the SEC] is open-ended as to the transactions which might be covered and the broad grant of authority to the SEC to define the particular practices banned by the statute supports the proposition that the statute was not intended to be limited as defendants assert ...

*Id.* at 1190–91.

Congress delegated a different and greater level of authority to the SEC pursuant to § 14(e) than it had pursuant to § 10(b). With the 1970 amendment to § 14(e), Congress specifically authorized the SEC not only to define fraud but also to "prescribe means reasonably designed to prevent" fraudulent acts and practices. That provision "gives the [SEC] latitude to regulate *nondeceptive activities* as a *'reasonably designed'* means of preventing manipulative acts ..." *Schreiber, supra* 472 U.S. at 11 n. 11, 105 S.Ct. at 2464 n. 11 (emphasis added). The provision goes beyond the authority that was made available to the SEC pursuant to § 10(b). The Court's review of Rule 14e–3's history—with its special emphasis on both disclosure in the specific context of tender offers and means reasonably designed to prevent fraud—satisfies the Court that Congress intended to permit the SEC to promulgate a "disclose or abstain from trading" rule along the lines of 14e–3.

The Court's conclusion is strengthened by Congressional enactment of § 21(d) of the Insider Trading Sanctions Act of 1984 ("ITSA"), 15 U.S.C. § 78u(d). That Act provides for the imposition of treble civil penalties on those who violate SEC rules and regulations "by purchasing or selling a security while in possession of material nonpublic information ..." 15 U.S.C. § 78u(d)(2)(A). Rule 14e–3 makes illegal just that sort of transaction. Indeed, in 1983, Congress was specifically made aware that a violation of Rule 14e–3 would trigger the civil liability outlined in ITSA. *See* H.R.Rep. No. 355, 98th Cong., 1st Sess. 13 n. 20 (1983). The adoption of ITSA provides further indication of Congressional approval of Rule 14e–3. *See Zemel v. Rusk*, 381 U.S. 1, 12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1964) ("Congress ... though it once again enacted legislation relating to [the issue at hand] left completely untouched the broad rule-making authority granted in the earlier Act.")[5]

To support his position, Chestman relies on a series of cases that interprets not Rule

---

**5.** *See also National Labor Relations Board v. Bell Aerospace Company,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress. We have also recognized that subsequent legislation declaring the intent of an earlier statute is entitled to significant weight") (footnotes omitted); *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 381–82, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969) ("Here, the Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation") (footnote omitted).

14e–3, but rather Rule 10b–5. *See, e.g., Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1979); *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).[6] Defendant attempts to minimize this fact by noting that "the courts have already recognized the virtual identity between the language in § 10(b) and that in § 14(e). *See, e.g., Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 10 [105 S.Ct. 2458, 2463, 86 L.Ed.2d 1] (1985); *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir.), *cert. denied,* 414 U.S. 910 [94 S.Ct. 231, 38 L.Ed.2d 148] (1973)." Def. Reply Mem. at 3 n. 2. By implying that the two provisions are identical and are intended to cover the same transactions, defendant, however, presents an obscured picture of the Supreme Court's analysis. In *Schreiber,* the Supreme Court did note that "it is often assumed that § 14(e) was modeled on § 10(b) ..." *Id.* 472 U.S. at 10 n. 10, 105 S.Ct. at 2463 n. 10. But the Court also explained that § 14(e) *supplements* other disclosure provisions in the Williams Act and requires disclosure "more explicitly addressed to the tender offer context than that required by § 10(b)." *Id.* at 11, 105 S.Ct. at 2464. The fact that one provision is *modeled* on another does not necessarily indicate an identical reach. Defendant also emphasizes the fact that "[t]he Second Circuit has recognized that the standards used to interpret § 10(b) and § 14(e) are virtually identical." Def. Reply Mem. at 2 (citations omitted). That may be so. But a court may use the same standards to evaluate two different statutes and thereupon reach two different conclusions. Moreover, it remains unclear why Congress would go to the trouble of passing what defendant, in effect, contends is a superfluous and wholly repetitive statutory provision. The more compelling conclusion is that Congress did not intend such a result.

In addition, defendant mistakenly relies on *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 10, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985) for the proposition that "the Supreme Court has held that the reach of § 14(e) should be interpreted as equivalent, at *most,* to that of § 10(b)." Def. Reply Mem. at 2 (emphasis in original). Nothing in the Supreme Court's *Schreiber* opinion supports that assertion. In *Schreiber,* the Court concluded only that "the term 'manipulative' as used in § 14(e) requires misrepresentation or nondisclosure." *Schreiber, supra* at 12, 105 S.Ct. at 2464. The Court in no way limited the greater level of rulemaking authority delegated to the SEC by the 1970 amendment to § 14(e).[7] Pursuant to that authority, the SEC promulgated Rule 14e–3, which this Court has determined represents a valid exercise of the SEC's authority.[8]

## B. The requisite level of intent:

██ Defendant argues that Rule 14e–3 imposes liability based on a quasi-negligence standard—those who "know or have reason to know"—which falls far below the scienter standard required by the Supreme Court for insider trading cases. In response, the government advances two arguments. First, the government contends that defendant's position is irrelevant because the standard of liability in this criminal case is supplied by 15 U.S.C. 78ff ("any person who willfully violates any provision

---

6. Those cases stand generally for the proposition that there can be no violation of Rule 10b–5 absent a duty to disclose arising from a relationship of trust and confidence. They rejected the proposition that 10b–5 imposes a fiduciary duty to disclose before trading on anyone who knowingly receives nonpublic material information from an insider.

7. It is also worth noting that the Second Circuit's opinion in *Chris-Craft* was announced seven years before the SEC adopted Rule 14e–3.

8. The Court's decision effectively addresses defendant's contention that Rule 14e–3 is invalid because "mere possession" is not a sufficient basis for an insider trading law. *See* Def. Mem. at 6–7. The rule requires more than mere possession. It also requires that the trader know or have reason to know that the information he received is material and nonpublic, and that it came from the offeror, target, or one of their insiders. Further, the Supreme Court's holding in *Chiarella,* 445 U.S. at 235, 100 S.Ct. at 1118—relied upon by defendant to support his position on this point—evaluated the scope and legislative history of § 10(b), not § 14(e).

of this chapter ...."). Second, the government argues that, even if this Court were to determine that § 14(e) imposes a scienter requirement, then the Court need not invalidate the rule but only read a scienter requirement into the rule, much as the Supreme Court has done with Rule 10b–5. *See Ernst & Ernst, supra.* The Court agrees with the government's first argument and, as a result, finds it unnecessary to reach its second.

In a criminal case alleging violations of SEC rules, § 78ff provides the level of intent required for conviction. The government must prove willful misconduct, which is to say that the defendant was aware of what he was doing, that his acts were done intentionally and deliberately and not as a result of an innocent mistake, negligence or inadvertence. *See United States v. Dixon,* 536 F.2d 1388, 1395, 1397 (2nd Cir. 1976); *United States v. Chiarella,* 588 F.2d 1358, 1370 (2d Cir.1978), *rev'd on other grounds,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1979).

At trial, the Court will instruct the jury carefully on the standard of liability in this case. Towards that end, the Court will explain to the jury that, although Rule 14e–3 contains the language "know or have reason to know," it must nonetheless render a guilty verdict only if it concludes that the government has met the higher and more demanding burden of proof embodied in § 78ff.

### 3. Whether the counts are multiplicitous:

█ Defendant's final motion seeks an order declaring Counts One through Thirty of the indictment to be multiplicitous and directing the government to elect. In the alternative, defendant argues that, even if the indictment is not technically multiplicitous, the Court should nonetheless order the government to elect because the multiplication of counts will confuse and prejudice the jury. The Court disagrees with each argument.

The Second Circuit has explained a court's role in determining whether or not an indictment is multiplicitous.

The basic inquiry is whether each offense charged requires proof of a fact which the other does not. *Blockburger v. United States,* 284 U.S. 299, 304 [52 S.Ct. 180, 182, 76 L.Ed. 306] (1932)....
[W]hen the *Blockburger* test for multiplicity has been satisfied, and there is no evidence of congressional intent to the contrary, authority to impose cumulative penalties is presumed to be intended.

*United States v. Reed,* 639 F.2d 896, 905–6 (2d Cir.1981).

The thirty counts at issue satisfy this test. The mail fraud counts, unlike the Rule 10b–5 and Rule 14e–3 counts, require proof that defendant made use of the postal service. *See Reed, supra* at 905. Given the Court's conclusions elsewhere in this opinion, the Rule 10b–5 counts similarly require proof of at least one element that the Rule 14e–3 counts do not—namely, proof of breach of a duty. Defendant has advanced no evidence of Congressional intent to prohibit cumulative penalties for the violation of each of the three statutes at issue in this case. The Court is mindful of its duty to insure that issues for jury consideration are presented clearly, and finds merit neither in defendant's argument that the counts as charged will confuse the jury, nor in his contention that the "mere making of the charges would prejudice the defendant with the jury." *Reed, supra* at 904 n. 6.

### CONCLUSION

For the reasons set forth above, the Court denies defendant's motions in their entirety.

SO ORDERED.