**UNITED STATES of America**

v.

**Joseph J. SANTOPIETRO, et al.**

**Crim. No. 3:91CR00065(TFGD).**

United States District Court,
D. Connecticut.

Jan. 28, 1992.

Holly B. Fitzsimmons, and Amy B. Lederer, Asst. U.S. Attys., D. of Conn. (Albert S. Dabrowski, U.S. Atty.), Bridgeport, CT, for Government.

Hugh F. Keefe, Suzanne McAlpine (Lynch, Traub, Keefe & Errante) New Haven, CT, for Joseph J. Santopietro.

Paul Yamin, Waterbury, CT, for Perry Pisciotti.

Jules Sack, New York City, for Fred Giusti.

Joseph F. Keefe, David Moraghan (Smith, Keefe, Conti & Moraghan), Torrington, CT, for Jack Giacomi.

Richard Cramer, Wethersfield, CT, for Robert Giacomi.

Joseph Fazzano, Patrick Tomasiewicz, Hartford, CT, for Paul Vitarelli.

Eileen McGann, West Redding, CT, for Jeffrey Santopietro.

**1010**

## RULING ON MOTION TO SUPPRESS STATEMENTS

DALY, District Judge.

The indictment in this case, returned by the Grand Jury on September 24, 1991, charges defendant Joseph J. Santopietro ("Defendant") with two counts of conspiracy, 18 U.S.C. § 371, seven counts of corrupt receipt of payment, 18 U.S.C. § 666(a)(1)(B), two counts of bank fraud, 18 U.S.C. § 1344, eight counts of embezzlement of federal funds, 18 U.S.C. § 665, and two counts of tax evasion, 26 U.S.C. § 7201. Having entered not guilty pleas to all of the alleged charges on October 4, 1991, the defendant now moves to suppress tape recordings of conversations between himself and Francis Donnarumma and himself and Joseph Tramuta.[1] For the reasons set forth below, defendant's motion is denied.

### BACKGROUND

The conversations that are the subject of the defendant's motion were taped by attorneys Donnarumma and Tramuta over a period extending from December 21, 1990 through March 11, 1991. The tape-recordings were made, with the knowledge and assistance of the United States Attorney's Office and the Federal Bureau of Investigation, in connection with an on-going investigation of official corruption in the City of Waterbury, Connecticut. During the period in question, the defendant was serving as the Mayor of Waterbury, Connecticut, Mr. Donnarumma was serving as Waterbury's Corporation Counsel and Mr. Tramuta was serving as an assistant to Mr. Donnarumma.

Defendant's arguments in support of suppression, including those arguments raised for the first time in his post-hearing submissions, can be distilled to the following: 1) that the government's conduct, pre-indictment, in allegedly eliciting the undercover assistance of attorneys Donnarumma and Tramuta, worked intentional and unlawful intrusions into privileged attorney-client relationships—those between the defendant and attorney Hugh F. Keefe, between the defendant and Mr. Donnarumma, and between the defendant and Mr. Tramuta—thereby violating the defendant's Sixth Amendment right to effective assistance of counsel;[2] 2) that the government's investigative technique—allegedly communicating with the defendant through "alter egos" in spite of its knowledge that the defendant was represented by Mr. Keefe—constituted an ethical violation warranting the Court's exercise of its supervisory power in favor of the suppression of the recordings; 3) that the government's law enforcement techniques were so outrageous as to constitute a violation of the defendant's Fifth Amendment due process rights; and 4) that the prejudicial nature of the conversations outweighs any probative value they might have and that the conversations, as such, are properly excludable under Rule 403 of the Federal Rules of Evidence.[3]

Defendant's motion almost invites the Court to discuss an array of provocative issues presumably implicated on the facts of this case. A detached analysis of the record, however, leaves the Court's course more earthbound. As explained more fully below, the facts of this case simply reveal no constitutional violations of the magnitude suggested by defendant, let alone any that would warrant the suppression here sought.

### DISCUSSION

#### I. THE SIXTH AMENDMENT CLAIM

##### A. *Attorney Keefe*

■ At the December 30, 1991 hearing on this motion, the defendant pursued a

---

1. A hearing on defendant's motion was held on December 30, 1991. References to the transcript of that hearing are cited herein as "Trans."

2. Encompassed within this claim is defendant's contention that insofar as the attorney-client privilege attaches to the recorded conversations, those conversations may not be disclosed.

3. Defendant's motion and supporting papers mention an additional claimed violation of defendant's Fifth Amendment right to be free from self-incrimination. *See* Deft's Mot. at 2; Deft's Post–Hearing Brief at 11. In the absence of any cited support, the Court finds this claim without merit.

new tack on his attorney-privilege claim, a tack only substantively developed for the first time in the defendant's post-hearing submissions. If the *focal point of defendant's initial filings* was the alleged privileged relationships between himself and attorneys Donnarumma and Tramuta,[4] his focal point at the hearing and in his post-hearing submissions has been instead the alleged privileged relationship, *at the time the recordings were made,* between himself and attorney Hugh F. Keefe.[5] Contending that he was represented by Mr. Keefe over the relevant period, and that the government was aware of such representation, defendant now advances the claim that "the Government had an affirmative obligation not to circumvent Santopietro's right to counsel by using Donnarumma and Tramuta as government agents to elicit information from Santopietro without his counsel's assistance." Deft's Post–Hearing Brief at 13. By allegedly ignoring this obligation, defendant submits that the government effectively denied him "the right to rely on counsel as a 'medium' between himself and the Government," thereby prejudicing his defense and the ability of his attorney to provide adequate representation. *Id.* at 14.[6]

■ The Court finds the defendant's claim without merit. Generally speaking, the Sixth Amendment right to effective assistance of counsel attaches only at or after the initiation of judicial proceedings against a defendant. *See Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 ("the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment'") (quotation and citations omitted), *reh'g denied,* 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (1977). This view of when the right attaches is "consistent not only with the literal language of the [Sixth] Amendment, which requires the existence of both a 'criminal prosecutio[n]' and an 'accused,'" *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984), but also with the purposes the right was designed to serve. As the Supreme Court has explained,

> [t]he initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.

4. Defendant's initial filings stress the alleged constitutional and ethical impropriety of the government's use in an undercover role of Waterbury's Corporation Counsel and the assistant to the Corporation Counsel. Alleging that "Santopietro's relationship with attorneys Donnarumma and Tramuta [went] far beyond what is required to establish an attorney-client relationship," Deft's Mem. in Supp. at 9, defendant maintains that any communications between himself and either Mr. Donnarumma or Mr. Tramuta over the relevant period are protected by the attorney-client privilege and accordingly cannot be disclosed without his valid waiver. He submits that the government's recordings of such communications worked intentional intrusions into these privileged relationships, intrusions which, to the extent they prejudice his defense and the ability of his attorney to provide effective assistance, amount to Sixth Amendment violations.

5. Mr. Keefe is defendant's attorney-of-record in this case.

6. Correctly noting that this additional claim is untimely raised, *see* Gov't Resp. to Post–Hearing Brief at 3, the government urges the Court to preclude the defendant from advancing it now. *See id.* at 3–4 ("the government was not on notice of this claim and therefore elicited no evidence about this question at the hearing") (footnote omitted). The Court notes, however, that the government failed to lodge any objection to this line of inquiry at the hearing, and that, in fact, the Assistant United States Attorney pursued the issue in her cross-examination of Mr. Donnarumma. *See, e.g.,* Trans. at 119. Accordingly, under all the circumstances and with an eye to the formidable stakes involved, the Court declines to preclude the defendant from pursuing this belated claim.

*Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972).[7]

In the case at bar, judicial proceedings were not initiated until September 24, 1991, the date the Grand Jury returned its indictment. Accordingly, even assuming the defendant has proven that he was, in fact, represented by Mr. Keefe over the relevant period, his Sixth Amendment right to effective assistance had not yet attached. Not having attached, the right logically could not be compromised. *Compare Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1963) (Sixth Amendment violation found where government surreptitiously listened to incriminating statements made by the defendant, post-indictment and knowing that the defendant had retained an attorney). Even assuming further that defendant's Sixth Amendment right had attached over the relevant period, his claim fails in the absence of a showing that any prejudice to his right flowed from the government's conduct. *See United States v. Irwin,* 612 F.2d 1182, 1186–87 (9th Cir. 1980) ("it is apparent that mere government intrusion into the attorney-client relationship, although not condoned by the Court, is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant") (footnote omitted). The defendant's conclusory statement that the alleged intrusion "prejudices Santopietro's defense and the ability of his defense attorney to provide adequate representation" plainly cannot suffice to carry his burden in this regard. Deft's Post–Hearing Brief at 14. Nor will the requisite prejudice be established by the mere fact that the substance of arguably privileged communications between the defendant and Mr. Keefe was passed to the government. *See United States v. Ginsberg,* 758 F.2d 823, 833 (2d Cir.1985) ("there can be no violation of the sixth amendment without some communication of *valuable* information derived from the intrusion to the government: absent such communication, there exists no realistic possibility of either prejudice to the defense or benefit to the government") (emphasis added) (citations omitted).[8]

**B.  *The Hammad Claim***

■  Invoking the letter and spirit of the Second Circuit Court of Appeals' decision in *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988), *cert. denied,* ——— U.S. ———, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990), defendant next urges suppression of the recordings as a necessary sanction for the government's alleged breach of Disciplinary Rule 7–104(A)(1) of the American Bar Association's Code of Professional Responsibility ("DR 7–104(A)(1)").[9] In *Hammad,* the Court held that DR 7–104(A) applied to criminal investigations and that its operation could extend beyond the reach of the Sixth Amendment, namely, to the investigatory stages of a criminal prosecution. The facts confronting the panel in *Hammad* were as follows: that the prosecutor knew that the subject of his investigation, Mr. Hammad, was represented by counsel when he directed an informant to arrange and record his conversations with Mr. Hammad, and that the prosecutor supplied the informant with a counterfeit Grand Jury subpoena to show the defendant during their meetings. Taking the prosecu-

---

**7.** While the right to counsel has been extended to certain "critical" pretrial proceedings, occasions where the defendant is confronted by the "procedural system, or by his expert adversary, or by both," *United States v. Ash,* 413 U.S. 300, 310, 93 S.Ct. 2568, 2574, 37 L.Ed.2d 619 (1973), no such occasion is implicated here, at least not on the present record. *See generally id.* at 309–13, 93 S.Ct. at 2573–75; *United States v. Wade,* 388 U.S. 218, 224–27, 87 S.Ct. 1926, 1930–32, 18 L.Ed.2d 1149 (1967).

**8.** Given the Ruling on this claim, the Court denies as moot the government's request that

the suppression hearing be reopened so as to allow it to present evidence on this issue. *See* Gov't Resp. to Post–Hearing Brief at 4.

**9.** The Rule states as follows:

"A.  During the course of his representation of a client a lawyer shall not:

1.  Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

DR 7–104(A)(1).

tor's deceptive investigative technique to task, the Second Circuit found that his conduct fell outside of the "authorized by law" exception to DR 7–104(A)(1) and that the government, as such, had violated the Rule.[10]

The Court of Appeals went to great lengths in the opinion, however, to stress that in assessing allegations of violations of the Rule in the investigatory stages of a prosecution, courts must weigh the facts of each case carefully, with an eye toward balancing the twin goals of respecting the protection afforded a defendant by DR 7–104(A)(1) and of allowing the use of effective law enforcement techniques. *See id.* at 839. Writing for the panel, Judge Kaufman urged "restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence" and cautioned that "the use of informants by government prosecutors in a preindictment, non-custodial situation, absent the type of misconduct that occurred in this case, will generally fall within the 'authorized by law' exception to DR 7–104(A)(1) and therefore will not be subject to sanctions [such as suppression]." *Id.* at 838, 840; *see also id.* at 839 ("[a]s we see it, under DR 7–104(A)(1), a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will *frequently* fall within the ambit of such authorization") (emphasis added).

Defendant submits that the government's "conduct in the instant case is even more egregious than the scenario in *Hammad*" and implicitly urges the Court to find that the government's use of attorneys Donnarumma and Tramuta falls outside the "authorized by law" exception. Deft's Post–Hearing Brief at 18. The Court cannot agree with the defendant's position. At the outset, in *Hammad*, as in two recent District Court cases applying its analysis, *United States v. Chestman,* 704 F.Supp. 451 (S.D.N.Y.1989), and *United States v. Buda,* 718 F.Supp. 1094 (W.D.N.Y.1989), the defendant was presumed or actually found to have retained counsel prior to or during the period in question and the prosecutor was presumed or actually found to have direct knowledge of such representation before engaging in the alleged improper conduct. In contrast, there is no concrete evidence in the case at bar that the defendant either had actually retained Mr. Keefe or other counsel or that the government had knowledge of any such formal attorney-client relationship. As argued by the government, the record contains "only sporadic references on the tapes to 'my guy,' 'my piece' and once to Hugh Keefe.... Even Santopietro's prehearing affidavit fails to allege that he retained Keefe in connection with the investigation while the taping was on-going; and the defendant presented no testimony at the hearing to support this contention." Gov't Resp. to Post–Hearing Brief at 4 n. 3. More significantly, the record is simply lacking any evidence that over the course of its investigation, the government employed as unfairly deceptive a device as the sham subpoena used in *Hammad.*[11] Nor,

---

**10.** Notwithstanding this finding, the Court of Appeals reversed the District Court's decision suppressing the recordings and videotapes in question, holding that "in light of the prior uncertainty regarding the reach of DR 7–104(A)(1), an exclusionary remedy is inappropriate in this case." *Id.* at 842.

**11.** Although the Court finds credible Mr. Donnarumma's testimony that the grand jury subpoena served upon him in March, 1991 was not "staged", *see* Trans. at 63 ("Q—And was that [service of the Grand Jury subpoena] staged so you could confront Mr. Santopietro with that, again, in order to provoke him into saying something? A—No."), two aspects of the government's discussion of this point are at best troublesome. *See* Gov't Resp. to Post–Hearing Brief at 12 n. 6. Although the government references exhibit 1, a purported attachment to its response—"the cover sheet of the transcript of Donnarumma's testimony before the grand jury"—the exhibit accompanies neither the filed nor courtesy copy version of the response. Of greater concern to the Court is the government's proffered "clarification" of Mr. Donnarumma's testimony at the hearing. Mr. Donnarumma was asked by defense counsel on direct examination whether he eventually went to the Grand Jury. He responded "No, I didn't." Trans. at 63. Presumably anxious that this portion of his testimony might suggest, contrary to Mr. Donnarumma's prior responses, that the subpoena was, in fact, "staged", the government under-

as discussed further in this opinion, *see infra* pp. 1014–1015, can the Court find that the government's use as informants of either Mr. Donnarumma or Mr. Tramuta constitutes such misconduct. The Court cannot, in sum, conclude that the government's investigatory tactics here constitute the type of misconduct contemplated in *Hammad*, that is, conduct that can be said to fall outside the Rule's "authorized by law" exception.[12]

### C. *Attorneys Donnarumma and Tramuta*

■ The Court finds similarly unavailing defendant's claim of a Sixth Amendment violation relating to attorneys Donnarumma and Tramuta. While it may very well be that the defendant "expected and intended that any communications between him and his attorneys would be held in the strictest confidence," Deft's Mem. in Supp. at 6, the only such communications afforded protection under the law are those that can be said to fall within the scope of the attorney-client privilege. As discussed below, no such protected conversations exist here.

Assuming, *arguendo*, that an attorney-client relationship existed over the relevant period between the former Mayor and his Corporation Counsel on the one hand, and between the former Mayor and the assistant to the Corporation Counsel on the other,[13] whether the conversations at issue are afforded the privilege's protections awaits the defendant's showing that any particular conversation related to a subject matter upon which professional advice was sought. *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (all elements of the privilege, including a showing that the communication relate to the subject matter upon which professional advice is sought, "must be established in order for the privilege to attach"); *see also id.* at 244 ("[t]he burden of establishing the attorney-client privilege, in all its elements, always rests upon the person asserting it"); *United States v. Gotti*, 771 F.Supp. 535, 542 (E.D.N.Y.1991) ("[t]he law places the burden on the person claiming the attorney-client privilege to establish all of its essential elements") (citations omitted). No such showing has been made in this case. After a careful review of the transcripts, *see*

takes to explain his testimony to the Court: "Donnarumma apparently understood [that] question ... to be an inquiry as to whether he had attended *on the date specified in the subpoena.*" Gov't Response to Post–Hearing Brief at 12 n. 6 (emphasis in original). The government's unsolicited clarification of Mr. Donnarumma's testimony is not well-taken, particularly where the government had the opportunity to cross-examine on this point but failed to do so.

12. The Court notes for the record that defendant's brief appears to have adopted an error contained in the *Chestman* opinion. Both the brief and the *Chestman* opinion, 704 F.Supp. at 453–54, purport to quote the following passage on page 840 of the *Hammad* opinion: "the use of informants by government prosecutors in a preindictment, non-custodial situation, absent the type of misconduct that occurred in this case, will generally fall within the 'authorized by law' exception...." Both, however, have inexplicably inserted the word "egregious" before the word "misconduct."

13. Whether Mr. Donnarumma's "client" was the Mayor, the City and its residents, or some other municipal entity, e.g., a City Council, is a complex question the Court need not resolve on the facts of this case. The question likely cannot, in

any event, be resolved on the present record. What little testimony and case law there is on this point suggests that the answer to the question may very well lie in the Charter of the City of Waterbury. That Charter is not before this Court, however, and neither side has asked the Court to take judicial notice of its contents. *See, e.g.,* Trans. at 120–21 (testimony of Francis Donnarumma) ("Q—Is it fair to say that there is no provision in the Charter for the advice that's given by the corporation counsel to any department head or agency head of the city, including the Mayor, be confidential? A—I don't recall anything in the Charter that addresses that."); *In re Grand Jury Subpoena*, 886 F.2d 135, 138 (6th Cir.1989) ("[u]nder the Detroit Code, corporation counsel represents *the City of Detroit* in all litigation, including condemnation proceedings.... Corporation counsel or special corporation counsel represents a single client, the City of Detroit, in all condemnation proceedings") (emphasis added); *Hanna v. Rewkowski*, 81 Misc.2d 498, 365 N.Y.S.2d 609, 611 (1975) (Section 20 of the Utica City Charter provides that the corporation counsel " 'shall, *when required by the common council,* prepare all legal papers for the city, or town of Utica, and shall be the legal adviser of the common council and of the other departments of the corporation' ") (emphasis in original).

Hearing Exh. 503, the Court concurs in the government's conclusion that none of the taped conversations involve subjects as to which an attorney-client relationship existed between either the defendant and Mr. Tramuta, or the defendant and Mr. Donnarumma.

> There is *no* conversation [on the tapes] about any of the matters minimally described in the defendant's moving papers as aspects of the alleged "on-going" attorney-client relationship between Donnarumma and Santopietro, including real estate closings and refinancings where Santopietro was the client, or any prenuptial agreement. Similarly, the conversations between Santopietro and Tramuta deal almost exclusively with the New Hartford property in which they were business partners, and the way the funds lent to Tramuta for the project by Security Savings & Loan Association were disbursed. The conversations do not involve any matters in which Santopietro might have been Tramuta's client.

Gov't Resp. to Mot. at 5–6; *see generally id.* at 4–9; Gov't Resp. to Post–Hearing Brief at 17. Accordingly, even assuming the existence of attorney-client relationships between these individuals, defendant's argument founders in the absence of an adequate showing that the recorded communications fall within the scope of the privilege afforded such relationships. *See Gotti,* 771 F.Supp. at 542 ("[t]he privilege is not available if the communication was not made for the purpose of obtaining legal advice").

## II. THE FIFTH AMENDMENT CLAIM

■ Defendant contends in sweeping fashion that "[t]he Government's conduct in intruding on the communications between Santopietro and his attorneys was so outrageous that it violated his Fifth Amendment due process rights." Deft's Mem. in Supp. at 16 (citation omitted); Deft's Post–Hearing Brief at 20–21 (citation omitted). Substantially for reasons already discussed, the Court finds the defendant's claim, which appears to address his relationship with Mr. Keefe as well as his relationships with attorneys Donnarumma and Tramuta, unfounded.

Where the government "violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct 'reach[ed] a demonstrable level of outrageousness.'" *United States v. Cuervelo,* 949 F.2d 559, 565 (2d Cir.1991) (quoting *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring)) (to be reported at 949 F.2d 559). To constitute such a violation, the government conduct at issue must be fundamentally unfair and "'shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (quoting *Kinsella v. United States,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)). Whether the conduct in question is so outrageous as to constitute a Fifth Amendment violation involves a consideration of the "totality of the circumstances with no single factor controlling." *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

The Court cannot conclude that the government's actions in this case were so outrageous as to "shock the universal sense of justice." As previously noted, none of the recorded conversations fall within the scope of the attorney-client privilege. Indeed, the testimony of both attorneys reveals that if anything, the government was scrupulous in instructing the attorneys to avoid any discussion of privileged matters. *See* Trans. at 90–91, 116–18, 136, 179–80; *compare United States v. Marshank,* 777 F.Supp. 1507, 1524 (N.D.Cal.1991) (outrageous government conduct found where, *inter alia,* a defense lawyer acting in an undercover capacity was "*never*" warned [by the government] not to engage in unethical behavior") (emphasis in original) (to be reported at 777 F.Supp. 1507). As the government aptly notes, precisely "[b]ecause of those precautions and that sensitivity [to the defendant's Sixth Amendment

rights and privileges], the defendant has been unable to point to a single specific conversation he can claim was privileged." Gov't Resp. to Mot. at 17. Nor did the government request Mr. Donnarumma to solicit information concerning any representation of the defendant by another attorney. *Id.* at 92, 103. The defendant has likewise failed to substantiate his claim that it was the government who "recruited" the attorneys to betray the defendant.[14] For these reasons and others set forth above, the Court finds the defendant's Fifth Amendment claim without merit.

### III. RULE 403 CLAIM

Defendant offers as his final argument the contention that insofar as "[t]he prejudicial nature of the recordings between Santopietro and Donnarumma and between Santopietro and Tramuta far outweigh their probative value", the recordings should be excluded under Rule 403 of the Federal Rules of Evidence. Deft's Post–Hearing Brief at 29. The Court finds this claim similarly unavailing, substantially for the reasons stated in the government's response. *See* Gov't Resp. to Post–Hearing Brief at 18–19.

### CONCLUSION

For the reasons set forth above, the defendant's motion to suppress statements is hereby DENIED.

SO ORDERED.

**14.** While a finding of outrageous government conduct would not necessarily flow from a finding that the overtures were made by the government rather than the attorneys or their representatives, defendant's motion would take on a new complexion were the proof to reveal that the government approached either attorney with the Hobson's choice of a wire or an indictment. The evidentiary record is not altogether clear on this point, with the sole testimony on the question being the following exchange between Mr. Donnarumma and the Assistant United States Attorney on cross-examination: "Q—And do you know whether Mr. Santos contacted the government on your behalf? A—He did." Trans. at 112. The government, without evidentiary support, further submits in its post-hearing response that it was "Donnarumma and Tramuta's respective counsel, upon learning from their clients that they had criminal exposure, [who] separately contacted the government and proffered substantial assistance at a time when it was beneficial to the investigation." Gov't Resp. to Post–Hearing Brief at 13 n. 7.