**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leroy JOHNSON, Carol Diane Tilley, and Lester Johnson, Defendants–Appellants.**

**No. 90–2452.**

United States Court of Appeals, Fifth Circuit.

Feb. 13, 1992.

Before POLITZ, Chief Judge, and HIGGINBOTHAM, Circuit Judge, and KAZEN,* District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Defendants Lester Johnson, Leroy Johnson, and Carol Diane Tilley were convicted of multiple crimes arising from drug activities in a Corpus Christi hotel owned by Lester Johnson. Lester Johnson argues here that the government violated his Sixth Amendment right to counsel by sending a government informant to question him after he had been indicted and obtained counsel. We agree and reverse his convictions and remand for a new trial.

Leroy Johnson challenges the sufficiency of the evidence supporting his conspiracy conviction. The record reflects sufficient evidence to support his conviction. Tilley raises numerous grounds on appeal, all of which are without merit. We affirm both convictions.

## I.

In 1986, after receiving reports of cocaine trafficking in the area, the Corpus Christi police department began surveillance of the Johnson's Rooms Motel, owned by Lester Johnson. They gathered evidence of an extensive cocaine operation based in the motel and arrested thirteen individuals, including Lester Johnson, Leroy Johnson,[1] and Carol Diane Tilley. A grand jury returned a twenty-seven count indictment against ten defendants on September 15, 1989. All of the other defendants entered plea agreements and agreed to cooperate with the government.

A jury convicted Lester Johnson of conspiracy to possess in excess of 5 kilograms of cocaine with the intent to distribute, engaging in a continuing criminal enterprise, maintaining a drug establishment, and laundering drug money. Leroy Johnson and Tilley were each convicted of con-

Vance D. Paton, Corpus Christi, Tex. (Court-appointed), for Leroy Johnson.

Nancy M. Simonson, Canales & Simonson, Corpus Christi, Tex., for Lester Johnson.

Kathlyn G. Snyder, Paula C. Offenhauser, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

---

* District Judge of the Southern District of Texas, sitting by designation.

1. As counsel has pointed out, Leroy Johnson is not related to Lester Johnson. Where necessary to avoid confusion we will refer to the two men by their first names.

spiracy to possess and possession of cocaine with the intent to distribute.

## II.

Lester Johnson argues that the government violated his Sixth Amendment right to counsel by using a co-defendant to question him without either the presence of counsel or a valid waiver of that right and that the receipt into evidence of the incriminating statements is reversible error. The district court rejected this argument. The facts found by the district court are straight forward. Johnson was present in court on November 9, 1989 when his co-defendant Arlion Ray Bullard announced his intention to enter a guilty plea. Bullard formally entered his plea pursuant to an agreement with the government on November 20, 1989, but Johnson was not present. After his plea, Bullard went to Austin.

On November 28, 1989, Johnson called Bullard in Austin and asked if he could talk to him in person. Bullard told him that he would be in Corpus Christi in about a week and they could talk then. Bullard then called his attorney, who advised him not to speak to Johnson.

Bullard next called the prosecutor who referred him to the IRS agent in charge of the case. The agent asked Bullard if he would be willing to be wired and talk to Johnson. Bullard agreed. The government concedes that the agents knew at this time that Johnson was represented by counsel.

On December 1, 1989, Bullard called Johnson from a Corpus Christi motel to see if he "could stop by and maybe have a beer or something." Johnson asked him to come over, but ended that telephone conversation by saying that he "can't talk about nothing about the case." The district court found that Johnson was concerned that his phone was bugged, not about discussing the case. Bullard and Johnson met twice in Johnson's home over the next two days.

The IRS agent testified that he instructed Bullard to listen and see what Johnson wanted. Bullard did much more. The district court found that Bullard "acted sympathetic to Johnson, his plight, and his fears." Throughout their conversation, Bullard drew Johnson to the case and the statement Bullard had made to the police. The second meeting consisted largely of Bullard showing Johnson his written statement and Johnson telling him what was wrong with it. In short, there is little doubt but that Bullard actively elicited incriminating statements from Johnson.

The transcripts also disclose Johnson's awareness that his meetings with Bullard were risky and against the advice of counsel. During the conversations, Johnson specifically referred to his concern about being "set up" by Bullard. He said he had considered the possibility but had concluded that Bullard would not do that to him. Bullard made sure that Johnson continued to believe he was meeting with him in defiance of the government's wishes. When Johnson was concerned that officers might be watching his home, Bullard replied "I know I'm paranoid too." When Johnson said he thought his phone was tapped, Bullard replied "maybe my phone is tapped too." Bullard expressed his opinion that his apartment was being watched. Consistently throughout the conversation, Bullard made statements portraying the government as his adversary.

Later in their conversation Bullard suggested that he might speak to his lawyer about something they had discussed. Lester objected strongly. He insisted that neither one of them tell their lawyers anything about their meetings. Johnson told Bullard that his lawyer had already warned him not to talk to Bullard and that he could not tell his lawyer that they had talked alone. Bullard testified at trial about the incriminating statements which Johnson made during these two meetings. Tapes of the statements secured by the wire Bullard wore were also admitted.

## A

 We first consider whether Johnson enjoyed a Sixth Amendment right to the presence of counsel when questioned

by Bullard. Once the government has instituted formal proceedings against a defendant, the Sixth Amendment renders statements "deliberately elicited" from the accused inadmissible in the government's case-in-chief "without an express waiver of the right to counsel." *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990).

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court first held that an accused has a Sixth Amendment right to be free of questioning by an undisclosed government informant in the absence of his counsel. Massiah's co-defendant became a secret government informant and engaged Massiah in a lengthy and incriminating conversation under police surveillance. The Court held that the guarantees of the Sixth Amendment would lose their efficacy if they did not apply to "indirect and surreptitious interrogations as well as those conducted in the jailhouse." *Id.* at 206, 84 S.Ct. at 1203. Therefore, the court adopted the rule that the Sixth Amendment is implicated whenever government agents "deliberately elicit" incriminating statements after indictment and in the absence of counsel. *Id.*

In its most recent visit of *Massiah*, *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the Supreme Court held that the Sixth Amendment right to counsel extends to attempts by government agents to deliberately elicit incriminating statements from the accused after his indictment even where the accused initiated the contact with the government agent. *Moulton* was a five to four decision but the dissenting justices' quarrel was with the application of *Massiah* to cases in which the post-indictment investigation was of crimes other than those charged. *Id.* at 492. In *Moulton*, the defendant made incriminating statements to his co-defendant who had come to see him at his request to help create a false alibi.

The Court said

Knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent. 106 S.Ct. at 487.

Bullard was acting as a government agent when he met with Johnson. The government understandably does not contend otherwise. He had entered into a *quid pro quo* agreement with the government before his meetings with Johnson. At Bullard's November 20, 1989, plea hearing, the government agreed that if Bullard pled guilty and helped to convict Lester Johnson, it would recommend a departure from the minimum mandatory sentence to an offense level of 15 under the Sentencing Guidelines. In addition, the prosecutor said that Bullard would receive an even more favorable sentencing recommendation to the extent that his testimony became "of even greater importance." Bullard testified that he remembered that statement as part of "the deal." It was after he had entered into this agreement with the prosecution that he agreed to go talk to Lester Johnson and wear a wire.

The government not only told Bullard that he would receive a lower sentence by doing more to convict Lester Johnson but also was intimately involved in the planning and execution of Bullard's meetings with Johnson. Government officers instructed Bullard what to do during the meetings, suggested that Bullard wear a recording device, monitored the conversations as they were occurring and provided Bullard with a copy of his statement to encourage Johnson's incriminating statements. On these facts, Bullard must be considered a government agent governed by the dictates of *Moulton*.

The government fully exploited this opportunity to question Johnson without his lawyer. Although the officers instructed Bullard not to ask Johnson about the case, he acted as more than a mere "listening

post." *See Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (Sixth Amendment is not violated by informant who makes no effort to stimulate conversations about the crime). As the district court found, Bullard not only did more than listen, but also initiated the discussion of the case which led to Johnson's incriminating statements. We conclude that Bullard's questioning of Johnson denied Johnson's Sixth Amendment right to counsel, unless he waived it. And waiver is where the government has elected to stand.

## B

"A waiver of the Sixth Amendment right to counsel is valid only when it reflects 'an intentional relinquishment or abandonment of a known right or privilege.'" *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). The government bears the burden of establishing waiver and the courts should "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986).

The key inquiry is whether the accused was "made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forego the aid of counsel." *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988). Johnson knew that Bullard had pled guilty, had provided a full statement to police, and had agreed to testify for the prosecution. But, and critically, he did not know that Bullard came to his home as a government agent with the purpose of eliciting and recording incriminating statements.

The government's heavy burden in showing a waiver of the right to counsel after the filing of charges and a request for counsel has been recently accented. In *Michigan v. Jackson,* the Supreme Court held that after a defendant has requested counsel, any waiver of the right to the presence of counsel obtained as a result of government-initiated interrogation is invalid. 106 S.Ct. at 1411. Assuming without deciding that Johnson's initial telephone call to Bullard removes this case from the direct effect of *Jackson,* we are nonetheless convinced that *Jackson* requires a high standard for a finding of waiver in this case. In the context of clandestine government interrogations, the identity of the party initiating contact is irrelevant. *Moulton,* 106 S.Ct. at 487. The government violates the accused's Sixth Amendment right to counsel by exploiting the opportunity to secretly question the accused after indictment and appointment of counsel regardless of who creates that opportunity. There is a strong argument that *Moulton* requires an express waiver of the right to counsel. *See Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (*Moulton* renders inadmissible statements deliberately elicited "without an express waiver of the right to counsel"). Even if there are situations in which a waiver may be inferred, however, the government must at least clearly demonstrate that the defendant waived his rights knowingly and intelligently.

There is always a risk that a former confidante may have turned, but that risk alone cannot support a finding of waiver of a constitutional right. *Moulton* makes that plain. The government argues that Johnson waived his rights because knowing of Bullard's plea and that he might testify at trial, Johnson had to know that Bullard might be a government agent. We are not persuaded. There is no evidence that Johnson knew of Bullard's deal with the government recited at Bullard's plea hearing on November 20 and the district court did not find that he knew. To the contrary, Bullard acted to assure Johnson that he was not a government agent. *See United States v. Geittmann,* 733 F.2d 1419 (10th Cir.1984) (government cannot argue that accused knew he was actually talking to the police where informant acted to convince him otherwise.). In short, we agree with the district court that Johnson deliber-

ately took the risk that Bullard might disclose their conversation. This is, however, a step removed from knowledge that he is an agent. Our question is whether this step is one beyond the protective reach of *Massiah* and *Moulton.*

▋ It is important to distinguish the concerns of *Moulton* from cases dealing with intrusion into the privacy of the attorney-client relationship. *Moulton* protects the right to be free of government interrogation without counsel after formal charges have been brought and counsel is secured. *Moulton,* 106 S.Ct. at 487. It recognizes that once the government has brought formal charges against an individual the adversary relationship between the parties is cemented. Once an accused has chosen to retain an attorney to act as his representative in this adversary process, the government may not try to circumvent the protection afforded by the presence of counsel during questioning. The vice is not deprivation of privacy, but interference with the parity required by the Sixth Amendment.

▋ Government interrogation is different in kind than statements made to non-government agents which may then be reported to authorities. There is no right to the presence of counsel when one talks to his co-defendants. However, *"government* efforts to elicit information from the accused, including interrogation, represent 'critical stages' at which the Sixth Amendment applies." *Michigan v. Jackson,* 106 S.Ct. at 1408 (emphasis added). There is a constitutional right to counsel when the questioning is by the government.

▋ *Moulton's* condemnation of the government's "exploitation" of the opportunity to obtain statements without counsel informs the level of knowledge required to find that the accused has waived his right to counsel. In any event, to infer waiver from the always present risk that a pleading co-defendant might be a government agent does not respond to *Moulton's* insistence that the government not act to circumvent or dilute the protection of the right to counsel. *Id.* 106 S.Ct. at 484. The government and Bullard did everything in

their power to convince Johnson that Bullard was on his side, not the government. It is difficult to accept their argument now that this questioning was not "secret." The record reflects that the government's exploited the opportunity to use Bullard to question Johnson and conceal the fact of their questioning. The logic of *Moulton* requires that the accused know he is being questioned by the government before he can knowingly waive his right not to be interrogated by the government without his lawyer.

▋ We must also reject the government's argument that Johnson had already received all the benefits his counsel could have given him. An attorney's advice to his client not to talk to a witness during government questioning is not the counsel assured by *Moulton.* A defendant's Sixth Amendment rights are not waived because his attorney has already told him not to make a statement. *See Brewer v. Williams,* 430 U.S. 387, 390, 97 S.Ct. 1232, 1235, 51 L.Ed.2d 424 (1977) (accused's right to counsel violated although attorney advised him not to talk to officer). After the initiation of formal charges the accused has the right to "rely on counsel as a medium between him and the State." *Moulton,* 106 S.Ct. at 487.

*Patterson* reinforced, not weakened, *Moulton's* protections. The court noted that its analysis of the waiver issue would be different if Patterson had already retained a lawyer "because once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." 108 S.Ct. at 2393, n. 3 (citing *Moulton*). The issue in *Patterson* was whether an accused who was given the *Miranda* warnings by a person identified to him as a government agent and signed a written waiver was provided with sufficient information to make a knowing and intelligent waiver of his Sixth Amendment right to counsel at post-arraignment questioning. The Court upheld this waiver. Significantly, *Patterson* knew that he would be questioned by the government. All that remained was to make clear to *Patterson*

that he had a right to counsel during the questioning and that any statements he made could be used against him. 108 S.Ct. at 2389. Nothing in *Patterson* erodes the requirement that waiver of a constitutional right be made knowingly and intelligently.

Nothing requires the government not to listen if it is the innocent recipient of evidence. *Michigan v. Harvey*, 110 S.Ct. at 1181. It is when the government *exploits* the opportunity to question a person charged with a crime and represented by a lawyer, that it must show that the accused knew he was being questioned by a government agent before we infer that he intended to do so. We cannot conclude from this record that Johnson "knowingly and intelligently" waived his right to have counsel present when he did not know that he was being questioned by a government agent.

The reality on the street is that speaking with a confidant risks that he may have turned. We do not tamper with this reality. The rules change, however, when an investigation matures to a charge and counsel is engaged. More formally stated, the Sixth Amendment limits the government's investigative method after the accused has been indicted and counsel has been retained.

We conclude that the government failed to meet its burden of proving that Johnson knew he was being questioned by a government agent. Because we find that this condition for waiver was not satisfied, we need not address whether the government satisfied the other requirements for waiver. Johnson had a right not to be questioned by a government agent without his lawyer and he did not waive that right. Bullard's testimony at trial and the tapes obtained by the wire he wore should not have been admitted into evidence. There is no suggestion that, if erroneous, admitting the evidence was not reversible error. We must reverse Lester Johnson's convictions and remand for a new trial.

## III.

Leroy Johnson's only argument on appeal is that his conviction for conspiracy to possess cocaine with intent to distribute was not supported by sufficient evidence. We find sufficient evidence and affirm.

In reviewing the sufficiency of the evidence supporting Leroy's conspiracy conviction, this Court "must examine the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the jury verdict." *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir.1989). To convict Leroy for his participation in Lester's conspiracy, the government must prove the existence of an agreement to possess with intent to distribute, his knowledge of the agreement and his voluntary participation in it. *United States v. Lewis*, 902 F.2d 1176, 1181 (5th Cir.1990). "These elements may be established by circumstantial evidence." *Id.*

The government presented overwhelming evidence that Leroy sold drugs from his room at the Johnson's Rooms Motel. In fact, Leroy concedes that he conducted numerous drug sales while living at the motel. He argues, however, that his actions were entirely independent of Lester's conspiracy and he is therefore not guilty of the conspiracy charged.

Leroy sold papers of cocaine from his room at the Johnson's Rooms both before and after he served a prison term for drug offenses. While Leroy was in prison, Lester paid the rent for Leroy's girlfriend and gave her an allowance. During the same period Lester gave Leroy's common law wife $150 per week to support her children.

After his release from prison, Leroy began selling drugs again from Room 3 at the motel. From April 1987 through March 1988, Leroy paid Lester $12,750 for the use of the room to sell cocaine and to cover other expenses, such as legal fees. Testimony as to these payments was corroborated by ledgers found in the room when Leroy was arrested. The evidence also demonstrated other connections between the two men such as the fact that Leroy bought a car and registered it in Lester's name and that Lester paid a $10,000 bond for Leroy.

In addition to this evidence of the financial dealings between Lester and Leroy, the

evidence of the way the cocaine business was conducted at the motel supports the conclusion that Lester and Leroy were cooperating, not competing, dealers. Testimony indicated that cocaine buyers bought their drugs from either Lester or Leroy depending upon who had supplies available. Many witnesses at the trial testified that they had bought cocaine from both men. Leroy reaped the benefits of Lester's organization, including particularly the services of his lookouts.

When we view the evidence in the light most favorable to the jury verdict, which we have briefly summarized, we are convinced that a rational jury could conclude beyond a reasonable doubt that Lester and Leroy agreed to distribute cocaine cooperatively from the motel. Lester supplied most of the overhead for the operation, in exchange for which Leroy paid thousands of dollars in rent for his room. The two dealers may not have cooperated in every aspect of their business arrangement but that is not required.

We affirm Leroy Johnson's conviction of conspiracy.

## IV.

■ Carol Diane Tilley's appeal is without merit. She argues first that her trial counsel was ineffective, but fails to demonstrate prejudice. In any event, she cannot clear the hurdle that ineffective assistance of counsel claims are generally not cognizable on direct appeal. *United States v. Higdon*, 832 F.2d 312, 313–14 (5th Cir.1987).

Tilley next argues that there was insufficient evidence to support her conviction for conspiracy and possession. We are not persuaded. There was ample evidence of Tilley's guilt based upon her own conduct.

■ Tilley also challenges the district court's application of the sentencing guidelines to her case because she was not involved in the conspiracy after November 1, 1987, the effective date of the Guidelines. The evidence demonstrated that the conspiracy continued well into 1988. The guidelines were appropriately applied to Tilley's case.

We reject out of hand Tilley's challenges to the racial composition of the venire and the district court's jury charge.

## V.

The trial court erred by admitting evidence of Lester Johnson's conversations with Bullard contrary to Johnson's Sixth Amendment right to counsel. We REVERSE his convictions and REMAND for a new trial. We reject Leroy Johnson's challenge to the sufficiency of the evidence to convict him of conspiracy and AFFIRM his conviction. We summarily reject Carol Diane Tilley's arguments and AFFIRM her convictions.

KAZEN, District Judge, dissenting in part:

I concur with Judge Higginbotham's able opinion affirming the convictions of Leroy Johnson and Carol Diane Tilley. I respectfully dissent from the reversal of Lester Johnson's conviction.

The majority concludes that the statements made by Lester Johnson ("Johnson") to his co-defendant Arlion "Ray" Bullard ("Bullard") were obtained in violation of Johnson's Sixth Amendment right to effective assistance of counsel and that Johnson did not knowingly waive that right. I disagree.

I agree with the trial court that Johnson effectively waived his right to counsel. Johnson knew Bullard had already pled guilty, that he had provided a full statement to the police, and that he had agreed to testify for the government. Johnson knew that he had a right to have his attorney present at his meetings with Bullard, but deliberately and intentionally chose not to do so.

The standard for determining the validity of a waiver of the right to counsel is whether the waiver "reflects 'an intentional relinquishment or abandonment of a known right or privilege.'" *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Johnson insist-

ed upon keeping his conversations with Bullard free from attorney interference, telling Bullard, "This ain't between my lawyer or your lawyer, this is between us!" Johnson's meetings with Bullard flew in the face of his attorney's advice not to speak to other witnesses.[1] The trial court found that "Johnson had received the benefit of counsel not to talk to Bullard and, knowing that Bullard was a cooperating witness, proceeded against counsel's advice." One who knows he has the right to counsel "is in a curious posture to later complain" that his waiver of that right was unknowing. *Id.* at 2395 (quoting *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977)).

This case is distinguishable from precedent cited as controlling by the majority because Johnson was aware that Bullard was assisting the government at the time of their meetings. On the contrary, *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) involved "a secret government informant." *Id.* at 479. The defendant there thought he was meeting with a friendly co-defendant to plan their joint defense strategy at trial. *Id.* at 487. The court held that by "concealing the fact that (the informant) was an agent of the State, the police denied (the defendant) the opportunity to consult with counsel...." *Id.* at 488. *See United States v. Henry*, 447 U.S. 264, 269, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980) (defendant unaware that cellmate acting as paid government informant); *Massiah v. United States*, 377 U.S. 201, 207, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964) (defendant did not know at time

of meeting that co-defendant had pleaded guilty and agreed to testify against him).

In this case, while Johnson perhaps did not know the specifics of Bullard's plea bargain with the Government, he definitely knew that Bullard was pleading guilty and cooperating with the Government. Indeed, the specific purpose of his overtures to Bullard was to determine the extent of Bullard's proposed testimony against him and to attempt to shape and limit that testimony. Nevertheless, the majority finds no Sixth Amendment waiver because Johnson did not know definitely that Bullard would convey the substance of their conversations to the authorities. Use of this subjective standard is not mandated by precedent. *See United States v. Melvin*, 650 F.2d 641, 645–46 (5th Cir. Unit B 1981) (no Sixth Amendment violation where defendant lacked reasonable expectation of confidentiality in communications made to attorney in presence of co-defendant who had "*not* joined the defense team") (emphasis in original); *see also United States v. Gartner*, 518 F.2d 633, 635 (2d Cir.) (right to counsel not violated where defendant knew at time of meeting that co-defendant had agreed to cooperate with government), *cert. denied*, 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975); *accord United States v. Bell*, 776 F.2d 965 (11th Cir.1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986).

*Patterson* instructs that the key inquiry in the waiver analysis is whether the defendant was sufficiently aware of his right to have counsel present during the questioning and of the possible consequences of a decision to forego that presence. 108 S.Ct.

---

1. Counsel's advice to Johnson had been to avoid communication with Bullard or any other government witnesses; Johnson chose not to follow this advice. As explained in *Patterson:*
 [A]n attorney's role at postindictment questioning is rather limited, and substantially different from the attorney's role in later phases of criminal proceedings.... [D]uring postindictment questioning, a lawyer's role is rather unidimensional: largely limited to advising his client as to what questions to answer and which ones to decline to answer.
 *Patterson*, 108 S.Ct. at 2395–96 n. 6.
 The role of Johnson's attorney at the meetings would have necessarily been limited to advising

Johnson not to discuss the case with Bullard at all. The logical basis for this advice was the attorney's knowledge that Bullard was cooperating with the government and intended to testify against Johnson. Obviously, there would have been no meetings had Johnson's attorney been present. Johnson knew this, and as a result chose not to have his counsel present. This choice constituted a knowing waiver of his right to counsel. *See id.* at 2397–98 ("pragmatic" approach to waiver question is determination of what purposes lawyer can serve at particular stage of proceeding and what assistance he could provide to accused).

at 2395. Johnson clearly knew that he had the right to have counsel present and, equally clearly, did not want counsel's presence.[2] Johnson also knew what the attorney could do for him during questioning, "namely, advise (him) to refrain from making any ... statements." *Id.* Indeed his attorney had already given him that precise advice, and he deliberately chose to ignore it.[3] As the majority recognizes, Johnson was aware that his meetings with Bullard were risky and specifically expressed concern about being "set up" by Bullard, but ultimately concluded that Bullard would not do that.

Johnson knew that a possible consequence of ignoring his own counsel's advice was that Bullard would actually report incriminating statements to the government. Johnson did not suffer from lack of knowledge, but rather from an error in judgment. Obviously, Johnson did "later regret his decision to speak with" Bullard, but "the Sixth Amendment does not disable a criminal defendant from exercising his free will." *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 1182, 108 L.Ed.2d 293 (1990).

To summarize, Johnson's statements were not physically coerced by any government agent, he voluntarily initiated the meetings with Bullard, he knew that Bullard had already agreed to help the government by testifying against him at the upcoming trial, he had an attorney and knew he had the right to have his attorney present at the meetings with Bullard, his attorney specifically advised him not to talk with Bullard, he deliberately ignored that advice and made the conscious choice to meet Bullard without his attorney, he specifically weighed the possibility that he would be "set up" by Bullard, and he deliberately chose to take that risk. Notwithstanding all that, he will now be afforded a new trial at which his voluntary statements will be suppressed. I respect the sanctity of the attorney-client relationship but under the circumstances of this particular case, to hold that Johnson did not waive his Sixth Amendment rights is "to imprison (him) in his privileges and call it the Constitution." *Id.* at 1182 (quoting *Adams v. United States, ex rel. McCann*, 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)).

2. The following are excerpts from the Johnson–Bullard taped conversations:

> Johnson: No. Listen to what I'm saying. Let's get this straight right now. Right now. This ain't between my lawyer or your lawyer, this is between us!
> Bullard: Okay, so this one of those between us.
> Johnson: Yeah. Neither one is to know.
> Bullard: Okay. Okay.
> Johnson: God, don't tell Tinker you and I discussed and we talked alone I can't tell my lawyer that.
> Bullard: Okay.
> Johnson: Please
> Bullard: Okay, Candy.
> Johnson: My lawyer already warned me not to do that that's why I told you I may go to jail. He's already called me—not today but yesterday.
> Bullard: Okay.
> Johnson: But then too you see this is what you don't understand, is, my lawyer they always stick together.
> Bullard: Okay, that's understood, get back to your track.

> Johnson: Might tell
> Bullard: I understand that—I understand.
> Johnson: They might tell the US Attorney—these two are between us will—that my lawyer, don't know about your lawyer and my lawyer don't know.

3. In that regard, *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) is distinguishable. It is true that the attorney there had telephonically advised his client not to discuss the case with the police. The actual finding of the Supreme Court, however, was based on the defendant's "consistent reliance upon the advice of counsel in dealing with the authorities." *Id.* at 404, 97 S.Ct. at 1242. In fact, during the motor trip, shortly before blurting out the incriminating statements to the agents, Williams again stated that he would talk only after seeing his attorney upon arrival at their destination. *Id.* at 405, 97 S.Ct. at 1243. In contrast, Johnson unequivocally asserted to Bullard that he wanted his attorney to have no involvement whatsoever in their discussions.