IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8165
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

                      versus

RICHARD LEE HEINZ, ET AL.,

                                        Defendants-Appellees,

_____

Appeal from the United States District Court for the
Western District of Texas

_____

(January 26, 1993)

Before JOLLY and DUHÉ, Circuit Judges, and PARKER,[*] District Judge.

PER CURIAM:

The question presented by this appeal is whether the district court erred in concluding that the government's prosecutorial and investigatory conduct toward defendant-appellees was so improper as to render taped telephone conversations between Heinz and the government's agent subject to suppression. The question must be analyzed by the light of the Sixth Amendment. Upon such analysis, we hold that the government's conduct did not violate Heinz's Sixth Amendment right to counsel.

_____

[*]Chief Judge, Eastern District of Texas, sitting by designation.

Ted Mitchell is an attorney licensed to practice law in the State of Texas. The district court found that Mitchell had on occasions in the past given legal advice in certain civil matters to Charles Patillo and to defendants-appellees: Richard Lee Heinz, Michael Scott Wilshursen, and Jack Delano Carsrud.[1] However, the communications between Ted Mitchell and the defendants that the defendants seek to suppress were communications allegedly in furtherance of criminal activity--namely, avoiding prosecution for bank fraud and money laundering.

On December 13, 1989, a series of evidentiary search warrants were executed on premises controlled by various defendants. No charges were filed against any of the defendants. The defendants, however, received grand jury subpoenas requiring them to appear and testify in January before the grand jury in Austin, Texas.

One of these search warrants was executed in the Corpus Christi office of Heinz and Wilshursen. At that time, Heinz was

---

[1]For example, Mitchell was retained as a lawyer for Texas Southern Exploration Company, in which company Heinz is a partner and part owner. See Exhibit "A" to Heinz's Notice of Intent to Claim Attorney-Client Privilege and Prevent Use of Tapes 96, 97, and 98 by the Government. Moreover, Heinz consulted with Mitchell as a lawyer regarding a monetary transaction involving Charles Patillo's cashing of Heinz's checks in a fraudulent manner at the NCNB Bank in Austin, Texas. Exhibit "B" to Heinz's Notice of Intent to Claim Attorney-Client Privilege and Prevent Use of Tapes 96, 97, and 98 by the Government. Other defendants appear to have sought legal advice from Mitchell. See e.g., Transcript of March 13, 1992 Hearing on Motions, at 88-92 (testimony of Ted Mitchell regarding his law-oriented dealings with Carsrud).

read his "Miranda rights," and he invoked his right to counsel and right to remain silent--affirmatively refusing to speak with the investigating agents without the presence of his attorney.[2]

Another of the search warrants was executed the next day directed to Ted Mitchell's briefcase, in which agents apparently found evidence of money laundering. That same day, Mitchell entered into a plea agreement with prosecutors, in which he agreed to cooperate in the investigation of the other defendants.[3]

The government admits that the defendants were targets of a criminal investigation at the time, and even before the execution of the search warrants on December 13, 1989. On December 22, Corpus Christi IRS Agent Wentrcek was contacted by Attorney Rich Rogers, who informed the agent that he was representing Heinz regarding the matters before the grand jury. Wentrcek informed Rogers that he was a special agent in the Criminal Investigation Division of the Internal Revenue Service working under the direction of Assistant United States Attorney Blankinship.

On December 26, 1989, Mitchell called IRS Agent Abel Trevino in Austin, Texas, and told him defendants were planning to commit perjury before the Austin Grand Jury. (Trevino and Wentrcek operated as co-"Case agents" on the money laundering and fraud cases.) Mitchell told Trevino that the defendants knew they were

---

[2]See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

[3]Charles Patillo also pled guilty and agreed to cooperate with the government.

under investigation by federal agents and "wanted to get their story straight."

Between December 27 and 28, 1989, Mitchell--while in the company of Agent Trevino--had three telephone conversations with Heinz. Trevino "consensually monitored" these conversations, in which Mitchell acquired testimonial evidence apparently incriminating to Heinz and Heinz's fellow defendants.[4] Carsrud was with Heinz during at least one of the conversations, but did not talk to Mitchell. During another of the conversations, Heinz was apparently speaking from the office of Wilshursen.

Trevino testified that he was personally unaware that Heinz was represented by counsel at the time he taped these conversations between Mitchell and Heinz. He admits that his co-"case agent" Wentrcek knew as of December 22, 1989, that Heinz was represented by counsel in the grand jury matters, but stated that he himself "probably didn't know" this--that he did not know this "until just recently." But during the third tape-recorded conversation, Mitchell asked Heinz about what "Rogers" has told Heinz, an apparent reference to Rick Rogers, Heinz's attorney.

In January of 1990, the Austin Grand Jury was convened; defendants Carsrud and Byron Lewis Thomas testified before the Grand Jury about the case. On May 10, 1990, the defendants were

---

[4]The taped conversations between Heinz and Mitchell focus on facts underlying the government's money laundering and bank fraud allegations against defendants.

indicted for money laundering and bank fraud, perjury and conspiracy to commit perjury.

On March 13, 1992, the district court conducted an evidentiary hearing on defendants' suppression motion.  At this hearing, Trevino admitted that the documents he and his teammates discovered in Mitchell's briefcase on December 13, 1989, reflected Mitchell's previous representation of Heinz and Patillo.

On March 27, 1992, the district court granted defendants' motion to suppress from evidence the tape-recorded conversations between Mitchell and Heinz; the district court concluded that the government had violated Heinz's Sixth Amendment right to counsel.

The district court held that, even though Heinz had not been indicted, his Sixth Amendment right to counsel had attached before the December 27 and 28 tape-recorded telephone calls--because the case had reached a "critical state."  Examining the facts of the case, the district court concluded that at the time of the taping, the government and Heinz had become "adversaries."  The district court relied on Maine v. Moulton, 474 U.S. 159, 170, 106 S.Ct. 477, 484 (1985) and Escobedo v. Illinois, 378 U.S. 478, 490-491, 84 S.Ct. 1758, 1765 (1964).  In Moulton, the Supreme Court recognized that the right to counsel is shaped by the need for counsel, and noted that the right attaches at "critical" stages in the criminal justice process before trial.  Moulton, 474 U.S. at 170. Accordingly, the Court held that pursuant to the Sixth and Fourteenth Amendments, "a person is entitled to the help of an

attorney at or after the time that judicial proceedings have been initiated." Id. (quoting Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239 (1977)).  In Escobedo, the accused had requested and been denied an opportunity to consult with his lawyer, and the police had not effectively warned him of his right to remain silent.  The Supreme Court held that the police had violated Escobedo's right to counsel when the investigation was "no longer a general inquiry into an unsolved crime, but ha[d] begun to focus on a particular suspect, the suspect ha[d] been taken into police custody; [and] the police carr[ied] out a process of interrogations lending itself to eliciting incriminating statements."  Escobedo, 378 U.S. at 490-491.

## II

We reverse the district court on its Sixth Amendment ruling. Current law teaches that the Sixth Amendment right to counsel does not attach until or after the time formal adversary judicial proceedings have been initiated. See United States v. Gouveia, 467 U.S. 180, 187-190, 104 S.Ct. 2292, 2297-2299 (1984) (Rehnquist, J.), and authorities cited therein; McNeil v. Wisconsin, ___ U.S. ___, ___, 111 S.Ct. 2204, 2207-2211 (1991) (Scalia, J.).  See also United States v. Johnson, 954 F.2d 1015, 1019 (5th Cir. 1992); United states v. McClure, 786 F.2d 1286, 1290-1291 (5th Cir. 1986). This is so despite the fact that some earlier Supreme Court cases seem to imply that a more functional test for the attachment of the Sixth Amendment right to counsel is appropriate.  Compare e.g.,

-6-

Maine v. Moulton, 474 U.S. 159, 168-170, 106 S.Ct. 477, 483-484 (1986); United States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298 (1984) (Sixth Amendment right to counsel does not attach until such time as the "`government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified'") (quoting Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1926, 1936 (1967) (Sixth Amendment right to counsel attaches only when "the state [becomes] aligned against the accused."). Compare also United States Ex. Rel. Hall v. Lane, 804 F.2d 79, 82 (7th Cir. 1986) ("The right to counsel attaches only when a defendant proves that, at the time of the procedure in question, the government had crossed the constitutionally-significant divide from fact-finder to adversary.") (Citing DeAngelo v. Wainwright, 781 F.2d 1516, 1519-1520 (11th Cir.), cert. denied, 479 U.S. 953, 107 S.Ct. 444 (1986)).

III

Before concluding, we think we have a responsibility to address the arguments raised in the dissent. The dissent is ill-advised for several reasons. In the first place, the argument that the conversations between Mitchell and Heinz should be suppressed on grounds of a violation of the canons of ethics was not made or considered below, nor has the argument been made on appeal. The point has only been raised sua sponte by the dissenting judge.

Furthermore, our research shows that no court has ever suppressed evidence in a criminal case because a prosecutor on the

-7-

prosecutorial team--much less an investigator or an informant--violated DR 7-104(A)(1) in the course of an investigation and before the grand jury indicted the defendant. Indeed, the great weight of the authority is to the contrary: several courts have held that DR 7-104(A)(1) does not apply "during the investigative process before the initiation of criminal proceedings." United States v. Ryan, 903 F.2d 731, 740 (10th Cir. 1990); see also United States v. Sutton, 801 F.2d 1346 (D.C. Cir. 1986); United States v. Fitterer 710 F.2d 1328, 1333 (8th Cir. 1983); United States v. Kenny, 645 F.2d 1323, 1339 (9th Cir. 1981). In short, Judge Parker's conclusion that DR 7-104(A)(1) applies to the facts like those before us has been explicitly rejected by almost every court that has considered the issue.

Even assuming, however, that the ethical canons apply to the period during investigation and before indictment, they are not applicable in this case. The canons of ethics--unlike constitutional principles--apply to and control only the attorney's conduct and not the investigator's or informant's independent conduct. United States v. Vasquez, 675 F.2d 16, 17 (2d Cir. 1982); United States v. Jamil, 707 F.2d 638, 645-646 (2d Cir. 1983); United States v. Lemonokis, 485 F.2d 94, 941, 956 (D.C. Cir. 1973). Thus, DR 7-104(A)(1) would only apply to Agent Trevino if he was acting as Blankinship's alter ego, i.e., Blankinship was directing his actions. United States v. Massiah, 307 F.2d 62, 66 (2d Cir. 1962). Because Blankinship did not direct Trevino--indeed, he did

not even know what Trevino was doing--the ethical canons did not restrict Trevino's investigation of Heinz.

Moreover, it is absolutely irrelevant that Mitchell is an attorney. Mitchell was not Heinz's lawyer. Heinz had not retained Mitchell in any capacity, and Mitchell certainly did not represent Heinz in this case. Indeed, Mitchell had only advised Heinz on one or two occasions about totally unrelated civil matters. As far as this case is concerned, Mitchell was a co-defendant, pure and simple. The dissent refers to Mitchell as a "covert prosecutor" and an "alter ego" of the prosecutor. Nothing in the record supports this unwarranted characterization of Mitchell's role.

The dissent decries that Mitchell "traded on Heinz's trust." Unfortunately--or indeed fortunately for the public in many cases-- all co-defendants who turn state's evidence and cooperate with the government, "trade on," or have traded on, their fellow co-defendant's "trust." This method is the way a lot of criminals get convicted--legally and properly so. Nor is it exceptional that using Mitchell to garner information from Heinz was "inherently deceptive"; little information is acquired by "forthright" dealings of informers. Mitchell was simply a co-defendant-informant occupying the quite ordinary role of this breed of folks: providing incriminating evidence against their co-defendant to save their own hides.

Even if we could join in with the dissent's conclusion that the canons of ethics applied in this case, we could find no basis

to suppress the evidence.  The purpose of suppressing evidence is, primarily, to deter police and other government misconduct.  United States v. Leon, 486 U.S. 897, 104 S.Ct. 3405 (1984).  In this case, there has been no wilful misconduct by law enforcement officials.  Trevino did not know that Heinz was represented by counsel; even if he had known Heinz was represented, allowing Mitchell to telephone Heinz would not have violated any obligation the law imposes on Trevino because the Sixth Amendment does not apply.  Furthermore, Assistant United States Attorney Blankinship did not know that Heinz had retained an attorney or that Mitchell was making the phone calls to Heinz.  In other words, even if a violation of the canon of ethics occurred here pursuant to the "prosecutor team" theory of the dissent, the law enforcement officials did not engage in a wilful and knowing violation of the canon of ethics.  Consequently, under the good faith exception, the facts in this case do not justify our suppression of the evidence.

Finally, we think the position the dissent advances is unwise because of its consequences.  The dullest imagination can comprehend the devastating effect that such a rule would have on undercover operations.  Any potential defendant with an attorney would be insulated from any undercover operation; any potential defendant without an attorney would hire an attorney (if he could afford to do so) in order to build a wall between himself and the government's investigators.  It's effect would not be limited to undercover operations of course, but would impede, obstruct, and

even eliminate many continuing investigations of organized crime, racketeering, and drug dealing. The impact of such a rule would severely alter investigative operations in <u>all</u> criminal cases, except those investigations focused on run-of-the-mill criminals who cannot afford lawyers to serve as a wall between them and law enforcement.

This point raises a second and anomalous consequence of adopting this rule: The beneficiaries of Judge Parker's proposed holding would be the big time criminals with lawyers at their elbows to protect their rights, while such protection as the rule may provide against an overreaching government would not trickle down to those who cannot afford lawyers.

For these reasons, we respectfully reject the dissent.

IV

For the foregoing reasons, the district court's suppression order is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.


Robert M. Parker, District Judge, concurring in part and dissenting in part:

I concur in the majority's Sixth Amendment analysis. However, I am concerned about the prosecution team's utilization of a prosecutorial *alter ego* to secure statements from a target defendant who was, at the time of the clandestine interrogation,

represented by counsel on the matters about which the prosecutorial *alter ego* inquired. In my view, this conduct on the part of the government violated the courts' ethical canons. I would utilize this Court's inherent supervisory power -- to safeguard the integrity of the judicial process -- in order to suppress Heinz's statements on this alternative ground. The majority does not share my opinion in this regard, so I must dissent.

Some clarification is in order. First, Appellees' Brief raised the ethical canons argument on appeal. *See e.g.*, Brief for Appellees Richard Heinz and Scott Wilshusen, at pp. 14-18 ("the issue, the government's knowing violation of the Code of Professional Responsibility provides an alternative basis for affirmance."); *id.* at p. 16 ("The Court has supervisory authority over government attorneys and may in its discretion order suppression of evidence obtained in violation of a disciplinary rule.") (citing *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988)).

Furthermore, while it is true that no court has yet suppressed evidence because a prosecutor, investigator or informant violated DR 7-104(A)(1) in the course of an investigation -- and before a grand jury actually indicted a target -- my research has not found a single case factually "on all fours" with this one. And the body of caselaw partially referenced by the majority actually recognizes that a *case-by-case* analytical approach is to be utilized by courts contemplating whether their supervisory suppression authority is

-12-

warranted.  *See e.g., United States v. Hammad*, 858 F.2d 834, 840 (2d Cir. 1988) (Kaufman, J.).[1]  In short:  my conclusion that DR 7-104 (A)(1) applies to the facts before us, and counsels suppression of the tape recorded "conversations" between Mitchell and Heinz, has never been *addressed* -- let alone "explicitly rejected" -- by other courts construing the Rule.[2]  The peculiar, prosecutorial *alter ego* facts of this case make it a truly exceptional one.  The holding I espouse in this dissent is indeed quite narrow -- and incapable of producing the impediments to prosecution about which the majority has expressed concern.

Also, contrary to the majority's assertion and as I will explain, it is *extremely* relevant that Mitchell is an attorney. Mitchell is not "pure[ly] and simpl[y]" a "co-defendant."  First, in that Heinz had not been indicted at the time in question, Mitchell was no "co-defendant" of *Heinz's*.  Second, Mitchell is an attorney who had performed legal services for Heinz in the past.

---

[1]  This point too was made in the Appellees' Appellate Brief, at p. 16 ("In *Hammad*, the court declined to establish a bright line rule for determining whether suppression would be appropriate. Instead, *Hammad* utilized a case by case analysis.").

[2]  Also, in response to the majority's no-other-court-precedent-for-suppression argument, it is worth noting that the government's conduct in this case appears to have been motivated by a relatively recent phenomenon:  the *June 8, 1989,* "Thornburgh Memorandum."  The Thornburgh Memorandum closes with the categorical statement:  "the 'authorized by law' exemption to DR 7-104 applies to *all* communications with represented individuals by Department attorneys *or by others acting at their direction*."  Memorandum To All Justice Department Litigators From Dick Thornburgh, Attorney General, June 8, 1989, at p.7 (emphasis added).

This is a special sort of trust that Mitchell traded on -- *i.e.*, one that does not exist in the *typical* informant investigation. And most important is the fact that, because he is an attorney, Mitchell was able to act as a prosecutorial *alter ego* for the government. True, if it had been a non-lawyer doing the questioning of Heinz, the prosecutorial *alter ego* doctrine would require that person's questions and actions to be "directed" by a prosecutor. But by using a lawyer like Mitchell, the government attempted (and apparently has effectuated) an "end run" around the well-established prosecutorial *alter ego* doctrine -- and in so doing, has violated the integrity of the courts. Here is why.

In this case, when Heinz took steps to secure counsel, the government took impermissible steps in response; it moved to undercut Heinz's decision by using a lawyer to essentially interrogate Heinz about the matters for which he had retained counsel. Moreover, the government used a lawyer with whom Heinz had previously established an attorney-client trust. Impermissibly, Agent-Attorney Mitchell traded on Heinz's attorney-client trust when he accepted the government's job of covert prosecutor against Heinz. *Compare e.g., United States v. Lemonakis*, 485 F.2d 941, 956 (D.C. Cir. 1973) (code provisions appear designed in part to avoid the damage of "artful" legal questions; informant was not the *alter ego* of the U.S. Attorney's Office, so there was no ethical breach by the U.S. Attorneys prosecuting the case -- and thus, no need for the court to reach

the question of what legal consequences might flow had the ethics conclusion been otherwise), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586 (1974); *United States v. Schwimmer*, 882 F.2d 22, 28-29 (2d Cir. 1989) (as part of an on-going criminal investigation, the defendant had been lawfully subpoenaed to testify before the grand jury; "[h]e [was] not the target of that investigation, his testimony [was] immunized pursuant to § 6002, and he [could] consult with his counsel any time outside the grand jury room. Accordingly, the prosecutor's direct questioning of Schwimmer before the grand jury outside the presence of [the latter's] counsel [was] authorized by law and therefore [did] not violate the Code of Professional Responsibility."), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114 (1990). *Compare also United States v. Jamil*, 707 F.2d 638, 645-646 (2d Cir. 1983) (in pre-indictment context, *where government investigators were not acting as alter egos of prosecutor* and prosecutor only became aware of recording after it was made, Customs' agent's action in wiring [non-lawyer] informant and recording conversation with represented suspect did not violate DR 7-104; *DR 7-104 (A)(1) protects the defendant from the danger of being "tricked" by opposing counsel's artfully crafted questions into giving his case away.*); *United States v. Buda*, 718 F. Supp. 1094, 1095-1096 (W.D.N.Y. 1989) (distinguishing *Hammad*; prosecutor did not direct the (nonlawyer) informant to arrange and record informant's conversations with the defendant, and in no way attempted to direct the content of, or script, the informant's

conversation with the defendant so as to "beguile" the defendant into giving his case away to an *alter ego* of the prosecutor).

Starting on December 13, 1989 -- when he pleaded guilty and agreed to cooperate with law enforcement authorities -- Attorney Mitchell was a government agent.  He was acting as a government agent during the December 27 and 28 telephone "conversations" at issue.  *See generally United States v. Johnson*, 954 F.2d 1015, 1019 (5th Cir. 1992) (co-defendant who has pled guilty and agreed to cooperate with prosecutors is an agent of the government).  But Attorney Mitchell was not a typical, or "simple" "co-defendant-informant" during these "conversations."  His training enabled him to act, and he did act, as a *special sort* of deceptive government agent -- to wit:  the covert, interrogating, prosecutorial *alter ego*.

IRS Agent Trevino is presumed to have known that Defendant Heinz was represented by counsel as of December 22, 1989 on the money laundering and bank fraud matters discussed in the taped telephone "conversations," and that Mitchell was a lawyer who had represented Heinz in the past.  Such information was available to Trevino.  *See e.g.*, *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973), *overruled on other grounds*, *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984) (different arms of government, *especially when closely connected for the purpose of a case*, are not separate entities insulated from the knowledge and information possessed by

one another for purposes of *Brady*; the prosecution was deemed in possession of material that was contained in the files of the United States Postal Service); *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) (to the same effect). *See also United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.) ("The enforcement officials [who interviewed defendant in violation of the canons of ethics governing the actions of attorneys in all United States Courts in the circuit] are agents of the prosecuting party"), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758 (1973). And clearly, Agent-Attorney Mitchell actually knew Heinz was represented by counsel in the criminal investigation at issue. Mitchell said so at the district court's hearing on Defendants' motion to suppress. Transcript of March 13, 1992, Hearing on Motions (Testimony of Witnesses), at pp. 76-77 (Testimony of Ted Mitchell -- to the effect that before the recorded telephone conversations took place, Mitchell was aware that Defendant-Appellee Heinz had retained a lawyer by the name of Rogers).

More importantly, though: Agents Trevino and Mitchell's information and conduct is imputed to the case prosecutor, Blankinship. *See e.g., United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) ("Had the investigators been federal, their knowledge would have been imputed to the prosecution. In considering use of perjured testimony this Court has declined to draw a distinction between different agencies under the same government, focusing instead upon the '*prosecution team*' which

includes both investigative and prosecutorial personnel.") (emphasis added); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (holding that the prosecutor's lack of actual knowledge was not a valid excuse for a *Brady* violation: "[i]n the interests of inherent fairness," the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it; to hold otherwise would be "inviting and placing a premium on conduct unworthy of representatives of the United States Government."); *Thomas*, *supra*, at 112 ("The enforcement officials [who interviewed defendant in violation of the canons of ethics governing the actions of attorneys in all United States Courts in the circuit] are agents of the prosecuting party").

The prosecution team in this case traversed DR 7-104(a)(1) by thwarting the attorney-client relationship between Heinz and his defense counsel, in order to trick Heinz into incriminating himself to a covert prosecutor about matters for which Heinz had secured counsel.[3] The courts possess inherent supervisory power to

---

[3] The government has argued to this Court that the investigatory subject of the monitoring was perjury. *See e.g.,* Brief for the United States of America, at 16 ("The purpose of the taping was *not* to acquire information regarding the money-laundering and bank-fraud offenses, but rather for these embryonic potential cover-up offenses.") (emphasis added). However, the government recently supplemented the record (in response to a request by this Court) to include the application for (IRS) supervisory approval of the monitoring. And this application focuses on: 18 U.S.C. § 1956 (Laundering of monetary instruments); 31 U.S.C. § 5324 [Structuring transactions to evade reporting requirement (of 31 U.S.C. §5313(a) (Reports on domestic coins and currency transactions)) prohibited]; and 26 U.S.C. § 7201 (Attempt to evade or defeat tax). Box 19 ("Primary Alleged Offense(s)").

safeguard the criminal justice system from overzealous prosecutorial and investigative activities; they possess the power to safeguard the fair administration of justice. *See e.g., United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988) (balancing the twin administrative goals of respecting the protection provided by DR 7-104(A)(1), which goes *beyond* the protection provided by the Sixth Amendment, and of "imposing adequate safeguards without crippling law enforcement."), *cert. denied*, -- U.S. --, 111 S.Ct. 192 (1990) (emphasis added); *United States v. Lopez*, 765 F. Supp. 1433 (N.D. Cal. 1991) (to the same effect). The supervisory power theory "is premised on the inherent ability of the federal courts to 'formulate procedural rules not specifically required by the Constitution or the Congress.'" *United States v. McClintock*, 748 F.2d 1278, 1284 (9th Cir. 1984) (quoting *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978 (1983) (Burger, C.J.)), *cert. denied*, 474 U.S. 822, 106 S.Ct. 75 (1985). *See McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 612 (1943) (Frankfurter, J.) (the Constitution defines only the "minimal historic safeguards" defendants must receive, rather than the outer bounds of those courts may afford them).

---

While the application's narrative explanation of the would-be monitoring discloses that *one* of the topics of the calls was anticipated to be the "fabricating [of] testimony to provide an alibi concerning [the currency-oriented] criminal acts," the explanation concludes with the sweeping statement: "[t]he subjects to be monitored are involved in violation of *the[se] above noted statutes.*" (emphasis added)

It is well established that a federal court may use its supervisory powers to dismiss an indictment on the basis of governmental misconduct. *See e.g., United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978). But this remedy is disfavored. *United States v. Rogers*, 751 F.2d 1074, 1076-1077 (9th Cir. 1985) (citing: *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419 (1966); *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988)). In determining whether the government misconduct in a particular case is sufficiently egregious to warrant *dismissal* of an indictment, courts have been guided by two important considerations. First, courts frequently look to whether there is a *pattern* of similar government misconduct, on the theory that such widespread misconduct increases the threat to judicial integrity. *See e.g., United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114 (1985); *United States v. Rosenfield*, 780 F.2d 10, 11 (3d Cir. 1985), *cert. denied*, 478 U.S. 1004, 106 S.Ct. 3294 (1986); *United States v. Brown*, 602 F.2d 1073, 1076-1078 (2d Cir.), *cert. denied*, 444 U.S. 952, 100 S.Ct. 427 (1979). Second, courts look to whether there is an alternative remedy the court may use to preserve judicial integrity and deter future government misconduct. *See e.g., United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991) (Nelson, J., concurring). If there *is* an effective alternative remedy, the extreme remedy of dismissal is not justified. *See e.g., United States v. Lopez*, 765 F. Supp. 1433, 1460 (N.D. Cal. 1991).

The suppression of evidence is a remedy less drastic than the dismissal of an indictment -- and in my opinion it is the appropriate remedy for the prosecutorial misconduct in this case. *See United States v. Killian*, 639 F.2d 206, 210 (5th Cir.) (actions by U.S. Attorney's Office were "highly improper and unethical;" "[s]uppression of the statements would probably have been the appropriate sanction in this case, *were it not for the refusal of the government to use the statements.*") (emphasis added), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014 (1981). *Compare United States v. Thomas*, 474 F.2d 110, 111-112 (10th Cir.) (suppression may be the appropriate response of judiciary to prosecutorial violations of courts' canons of ethics), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758 (1973).

The applicable ethical rules of the Western District of Texas condemn the actions of the government toward Defendants. DR 7-104 (A)(1) provides:

> During the course of his representation of a client a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so. . . . [4]

---

[4] ABA DR 7-104(A)(1), ABA Model Rule of Professional Conduct 4.2, and Rule 4.02(a) of the Texas Code of Professional Responsibility share common language and purpose. For this reason, this Court will utilize authority and sources concerning all three in the course of this opinion (all three are adopted as standards by the Western District of Texas Local Rule AT-4 (Standards of Profession Conduct)).

The purpose underlying DR 7-104 (A)(1) and its analogues -- to protect the sanctity of the attorney-client relationship and by so doing, safeguard the integrity of the profession and preserve public confidence in our system of justice -- looms large within the context of the *criminal* justice system, in light of the gravity of the interests at stake in this system. The Sixth Amendment and the disciplinary rule serve separate, albeit similar purposes. *United States v. Hammad*, 858 F.2d 839, 843 (2d Cir. 1988), *cert. denied,* -- U.S. --, 111 S.Ct. 192 (1990). As already noted, the disciplinary rule secures protection not prescribed in the Constitution. *Id.*

The use of informants to gather evidence against a suspect will *generally, if not almost always,* fall within the ambit of the "authorized by law" exception to DR 7-104 (a)(1). *Hammad*, *supra*, 858 F.2d at 839. *See e.g., United States v. Chestman*, 704 F. Supp.

---

Model Rule 4.2 states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

And Texas Code of Professional Responsibility Rule 4.02(a) provides:

> In representing a client, a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

-22-

451, 453-454 (S.D.N.Y. 1989) (use of corporate insider informant to tape conversations with defendant accused of "insider trading" of stocks falls within the "authorized by law" exception).  But this practice does not do so *per se*.  The question of what prosecutorial conduct constitutes an ethical violation is to be determined on a case-by-case basis.  *Hammad, supra*, 858 F.2d at 836.

The prosecution team's questioning of *Heinz* was an *illegitimate* investigative-prosecutorial technique -- due to the deleterious consequences for the integrity of the administration of justice inhering in Government Agent-Attorney Mitchell's surreptitious, prosecutorial *alter ego* interrogation of Heinz.[5] The courts' canons of ethics prohibit prosecution teams from using *alter egos* to do what the prosecutors themselves cannot do.  Such utilization is certainly not "authorized by law." *United States v. Jamil*, 707 F.2d 638, 645 (2d Cir. 1983); *United States v. Ryans*, 903 F.2d 731, 735 (10th Cir.), *cert. denied*, -- U.S. --, 111 S.Ct. 152 (1990).  No alleged "chinese wall" should be allowed to provide team prosecutors access to the ill-gotten gains from such prosecutorial *alter ego* interrogations.  In today's world of advanced technology, such a rule runs an undue and unacceptable

---

[5] The recording transcripts reflect that Mitchell was an active questioner of Heinz in the three "conversations" at issue. It is also apparent that Trevino and Mitchell initiated the first recorded telephone "conversation" with Heinz, at 11:40 a.m. on December 27, 1989.  Transcripts of Consensually Monitored Conversation Between Ted Mitchell and Rick Heinz of 12/27/89 and 12/28/89 (TC 96, TC 97, and TC 98).

risk of sanctioning Orwellian investigative techniques and creating Kafkaesque judicial administration.[6]

In short: in his taped "conversations" with Heinz, Government Agent-Attorney Mitchell was acting as a clandestine prosecutor -- conducting an inherently deceptive (prosecutorial) interrogation. By enabling Lawyer-Agent Mitchell's breach of his own ethical duty not to contact Heinz -- who was known to be represented by counsel in the matters Mitchell sought to discuss with Heinz -- the prosecution team traversed the district court's ethical rules, and subverted the integrity of the criminal justice system. And I simply do not think the government should enjoy a "windfall" -- in the form of a citizen's rights and liberties -- from the misconduct of its prosecution team. *See United States v. Killian*, 639 F.2d 206, 210 (5th Cir.) (actions by U.S. Attorney's Office violated DR 7-104(A)(1); and "suppression of the statements would probably have been the appropriate sanction in this case, *were it not for the refusal of the government to use the statements*.") (emphasis added), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014 (1981). As the majority purports to recognize: "[t]he purpose of suppressing evidence is, primarily, to deter police and other government

---

[6] *See* GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949); FRANZ KAFKA, THE TRIAL (1925). *Compare* Richard Lacayo, *Nowhere to Hide: Using Computers, High-Tech Gadgets and Mountains of Data, an Army of Snoops is Assaulting Our Privacy*, TIME, Nov. 11, 1991, at 34 (cover story).

misconduct.  *United States v. Leon*, 486 U.S. 897, 104 S.Ct. 3405 (1984)."

The Appellees' Brief says:  "Although the district court did not *reach* the issue, the government's knowing violation of the Code of Professional Responsibility provides an alternative basis for affirmance."  Brief for Appellees Richard Heinz and Scott Wilshusen, at pp. 14-15 (emphasis added).  An examination of the record, however, reveals that a more accurate characterization would be that Defense Counsel failed to frame an attorney-client privilege issue for the district court in a manner clearly implicating the courts' ethical canons; and thus, the district court's order of March 27, 1992, addresses the defendants' motion to claim an attorney-client privilege between *Defendants and Mitchell*, while saying nothing about the (attorney-client) *ethical rule* violations addressed in this dissent.  Still, the DR 7-104(A)(1) argument was *clearly* presented to this Court.  And while it is rare for this Court to address an issue not taken up in the district court, issues involving the courts' canons of ethics are unique.  The courts -- both, trial courts and the courts of appeal -- have a significant, vested interest in safeguarding the integrity of the judicial system.  Indeed, judicial responses to prosecutorial violations of the courts' canons of ethics are not waivable by defendants alone.  *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758 (1973).

For the foregoing reasons, I would affirm the district court's suppression order on the ground that the government's conduct in this case infringed judicial integrity.